THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.* MALCOLM JACKSON, Defendant-Appellant.

(No. 73-4;

Fifth District—November 4, 1974.

Robert E. Farrell and Michael J. Rosborough, both of State Appellate Defender's Office, of Mt. Vernon, for appellant.

Robert H. Rice, State's Attorney, of Belleville (Robert L. Craig, Assistant State's Attorney, of counsel), for the People.

Mr. JUSTICE CARTER delivered the opinion of the court:

The defendant, Malcolm Jackson, and a co-defendant, Nathaniel Russell, were each named in an indictment charging aggravated assault and another indictment charging armed robbery. After a trial, the jury found the defendant, Jackson, guilty of both alleged offenses. After a hearing in aggravation and mitigation, the defendant was sentenced to concurrent terms of not less than 2 nor more than 5 years for aggravated assault and not less than 8 nor more than 25 years for armed robbery.

We believe the defendant was proven guilty beyond a reasonable doubt and that the trial court did not err in refusing to suppress the defendant's identification. However, the defendant must be resentenced on the aggravated assault count. The defendant bases his appeal on these three issues.

On February 13, 1972, two men entered a Moto service station in East St. Louis early in the morning. When the attendant turned his back, one man pulled a gun and announced a holdup. The attendant had been talking on the telephone and the party with whom he was talking called the police. The robbers took money, a money changer and a gun from the attendant and also money from the cash drawer. A hitchhiker in the station at the time was relieved of a watch and a ring. The co-defendant took the attendant and the hitchhiker outside to the attendant's car while

the defendant remained inside. At that moment Officer Eiskant of the East St. Louis Police Department arrived. He saw the three men in the attendant's car and ordered them out. As the three individuals came out of the car, the defendant, Jackson, rushed out of the service station and fired at Officer Eiskant, who ducked behind his car while the defendant fired again, running around the side of the building. Immediately, Eiskant gave a brief description of the defendant on his radio and gave chase. The defendant's companion and co-defendant, Russell, retrieved his gun and also ran. A few minutes later a Sergeant Comley arrived and received directions from the attendant and proceeded down the street. He saw men in an alley and ordered them to halt, identifying himself as a police officer. The co-defendant ducked behind a car and the defendant fired at Comley. Soon thereafter, the co-defendant was found and captured by Comley hiding in a parked car, which turned out to belong to the defendant's mother. Another officer, Thomas Ezell, was cruising in the immediate area looking for suspects and at that time the defendant walked out of a yard and was stopped by Ezell, offering no resistance. One weapon was recovered on the floor of the car in which the co-defendant was apprehended and two more weapons along with a hat, gloves, money changer, and cash were found on the roof and in the yard of a nearby house. Later at the police station, the watch and ring of the hitchhiker fell to the floor beside the defendant and were thought to have come from him. Money was found on both suspects. At the police station, the hitchhiker identified the defendant and the attendant identified both the defendant and the co-defendant.

Defendant's first contention that he was not proven guilty beyond a reasonable doubt does not stand up in the light of all the testimony and evidence.

Officer Eiskant, the first officer on the scene, positively identified the defendant as the man who had fired twice at him at the service station and a third time while he was pursuing the defendant down a street. He stated that he was 25 feet away when the first two shots were fired and the lighting was excellent at the service station. Officer Eiskant concluded his testimony by identifying a number of items found in the vicinity of the houses near the service station and where defendant and co-defendant were apprehended. These items are included in People's Exhibits 14 and 15. Exhibit 14 consisted of change and currency that he found in the immediate vicinity of 646 North 51st Street, a block away from the service station and the place where defendant was taken into custody. Exhibit 15 was a money changer found by Officer Eiskant hanging on a fence on the south side of 646 North 51st Street.

Sergeant Comley arrived at the service station after he heard Officer

Eiskant give a description on the car radio of a suspect. He then drove down a street near the service station and saw two figures come out of a passageway and he later identified them as the defendant and the co-defendant. Sergeant Comley then left his automobile and identified himself as a police officer. He then testified that the co-defendant "dropped out of sight" and the defendant ran back into the passageway after firing a shot at him. Sergeant Comley continued his search of the area.

The third East St. Louis police officer, Patrolman Ezell, who arrived at the scene talked with Sergeant Comley as to the description of the suspects, and he then drove a block from the service station. He observed the defendant standing near one of the houses in the area, and as he fit the description given to him by Comley, he placed the defendant under arrest.

An investigation of the scene where the robbery took place was conducted the next morning by Patrolman Lewis. A .38-caliber snub-nose gun was found by Lewis in the yard in the vicinity of 646 North 51st Street, and it was identified as People's Exhibit 4. This exhibit was later identified by Clifton Willis, assistant manager of the service station, as the gun that was kept at the service station. The other pistol was found by Lewis on the roof of a house in the same area, and also a hat on the other side of the same roof. These items were marked People's Exhibit 3 and 2, respectively, and admitted into evidence.

A jailer, two desk sergeants and the evidence custodian of the East St. Louis Police Department all testified as to the chain of custody of the exhibits.

The attendant at the service station in question, Charles Hill, testified that he allowed a hitchhiker to come into the station about 2:30 A.M. on February 13, 1972. While he was talking on the telephone about an hour later, two men requested to enter the service station building, and he opened the door for them to enter. After requesting cigarettes and some change, one of the men pulled a pistol. Hill then stated that he gave him the money from his pocket, and he took the money from the cash register. The other individual also had a gun and took his money changer, after talking with the hitchhiker in the corner of the building. One of the men identified by Hill as the co-defendant took the hitchhiker and Hill outside and got into Hill's car. The other individual, who stayed inside the service station at that time, was identified as the defendant, Jackson. Hill then started his car with the hitchhiker in the front seat and the co-defendant in the back seat, and then the police car arrived. Patrolman Eiskant, the driver, ordered the three men out of the attendant's car, and at that time the defendant came out of the station, firing a shot in the direction of Eiskant. The officer returned the

shot. At that time, the co-defendant reached back inside the car, picked up a gun and fled the scene. Hill identified People's Exhibit 4 as being the revolver which was taken from him by the defendant that night, and he also identified People's Exhibit 15, which was his money changer taken from him. Hill distinctly identified the defendant, Jackson, at the trial as one of the robbers, stating that "he had a good view of him in the station". He also adequately described him and his companion, the co-defendant. The lighting in and out of the service station was fine and until the defendant fled the scene, Hill was never more than 25 feet away from him.

The defendant's defense consisted of the testimony of the following people: the co-defendant, an Illinois Bureau of Investigation agent, an automobile mechanic, and a Stanley Sanders.

Co-defendant Russell testified for the defense, acknowledging his participation in the crime and his plea of guilty. He testified that a friend of his named Jimmy was the other participant and not the defendant. Although he had known Jimmy for 6 months, he only knew that he lived in St. Louis and did not know his last name. Under cross-examination, he admitted that he had known defendant for 5 years, that he had seen defendant's car prior to the night of this crime, but that he did not know that at the time he hid in the car after the robbery that the car was the defendant's.

The defendant's theory in the case apparently was that he was in the area as a result of his car having broken down, and he was apprehended near the residence of a person that he approached for help in taking care of his car. The defendant called witnesses in his defense, in addition to the co-defendant, and one of them was a Stanley Sanders, who testified that he took the defendant to the 600 block of 51st Street where the defendant's car was because he was told that defendant's car had broken down. The next witness was an Illinois Investigation Bureau agent who testified that he performed firearms discharge residue tests on the defendant, which were negative. The third witness was a Bernard Harris, who testified that a car belonging to defendant's mother was repaired in his shop subsequent to the offense. The prosecution had called a Johnny Houston, who lives next-door to the house where the evidence was retrieved. He testified that a black male came to his house in the early morning hours of the night of the crime, stating that his car had broken down and asking to use the telephone. Houston refused the request. Houston was advised by his family of noise in the back of the house. He then found the policeman and he further testified that he. could neither describe nor identify the man that came to the front door. ■■ The defendant alleges that the evidence against him was not

credible and cites *People v. Coulson*, 13 Ill.2d 290, and *People v. Gardner*, 35 Ill.2d 564. In *Coulson* the conviction rested almost solely on the testimony of the robbery victim, who had stated that he took the five men who stole his wallet to his house with a promise of more money and went inside alone while they waited outside. The court felt that this testimony "taxes the gullibility of the credulous" and reversed the conviction. However, the court stated that mere conflict of evidence shall be decided by the jury and not by the appellate court. In *Gardner* the court reversed a rape conviction where the only evidence was the identification by the victim and defendant's presence in the area. The victim gave conflicting descriptions but did identify the defendant in a one-man showup in her hospital room. The defendant further presented strong alibi evidence. The court held that in light of the strong unimpeached alibi and weakness in identification, the conviction could not stand on a doubtful, uncertain and vague identification. The State cites the general rule that the positive, credible identification by one witness with opportunity to see the defendant is sufficient to sustain the conviction even in the face of contradiction by the defendant's testimony. (*People v. Tribbett*, 41 Ill.2d 267; *People v. Stringer*, 52 Ill.2d 564.) The identification does not have to have been under perfect conditions or for a long period of time. (*People v. Stringer, supra; People v. Harris*, 46 Ill.2d 395.) This court has recently reaffirmed the reasonable-doubt standard and stated that the jury verdict would be overturned only where the verdict has been found to be palpably contrary to the evidence. (*People v. Irons*, 20 Ill.App.3d 125, 312 N.E.2d 664.) The State also cites this court's decision in *People v. Johnson*, 6 Ill.App.3d 1003. In that case the witness positively identified the defendant but could not describe his clothes, facial characteristics, or facial hair, and was unclear about height and weight. The court stated:

"In any event, lack of precise accuracy in describing a defendant's clothes and facial characteristics does not necessarily create a reasonable doubt of guilt. [Citations.] The test to be applied to positive in-court identification is not whether the witness gave a full description of features and attire of the defendant at the time of the crime but rather whether the witness was close enough to defendant for a sufficient length of time under adequate lighting conditions to be able to make a positive identification." 6 Ill.App. 3d 1003, 1006.

Such a determination is to be made in light of all circumstances in each case. It is the court's opinion that there was sufficient positive identification of the defendant for the jury to convict him.

■■ The second point in the defendant's appeal is whether or not the trial court erred in refusing to suppress the defendant's identification. Prior to and during the early stages of the trial, a hearing was had on the defendant's motion to suppress certain identification testimony. At the conclusion of evidence on such motion, the trial court denied the motion. Defendant contends that he was deprived of due process by an in-court identification by the victim based on a "tainted" lineup. The testimony at the hearing on the motion indicates that the defendant was incarcerated on the women's side of the cell block in the East St. Louis Jail. Outside the Detective Bureau is a hallway and apparently a waiting room. The defendant testified that he was taken from his cell to the bureau past the man who viewed him in the lineup. Defense counsel testified that, when he arrived he saw the defendant and others in the Detective Bureau room and three people in the hallway. He learned that they were witnesses, and thereupon he had them removed before the subjects were taken to the lineup room. He did not see the defendant walk past the witness. Hill, the service station attendant, testified that he was seated in the hallway and that both the defendant and the co-defendant walked past him only once. No evidence of the lineup appears and the defendant apparently does not otherwise question the propriety of the lineup. Hill picked both defendant and co-defendant from the lineup. There is no evidence that the defendant spoke with Hill during that time or that the police in any way indicated to Hill that the defendant was a suspect. There is no showing that the viewing was done intentionally by the police or with any malice. This court has held the test to be that pretrial identification violates due process only where it is "so impermissibly suggestive as to give rise to the substantial likelihood of irreparable misidentification." (*People v. Irons*, 20 Ill.App.3d 125, 312 N.E.2d 664.) This is not the case here. Even if the lineup itself were somewhat "tainted," in-court identification is properly admitted if "an independent origin exists on which the identification can be based." (*People v. Harris*, 46 Ill.2d 395; *People v. Bixler*, 49 Ill.2d 328; *People v. Patrick*, 53 Ill.2d 201.) Hill testified at the hearing that he told the policeman at the lineup, "How could I forget someone who has got a gun in my face?" Although Hill was unable to describe clothes worn by the robbers at the scene of the crime, he did state that the defendant wore sunglasses, had a goatee, but no moustache and that his hair was "full." At the trial, Hill testified that defendant wore sunglasses and gloves and had facial hair, at least a goatee, though he was unclear about hair. The trial court correctly denied defendant's motion to suppress the identification. There is no doubt that the victim had sufficient

independent origin for his in-court identification to refute any "taint." He had an opportunity to see the robbers and observe them for a sufficient length of time and under proper circumstances.

■■■ The final contention of the defendant is that his concurrent sentences of from 2 to 5 years for aggravated assault and from 8 to 25 years for armed robbery should be reduced and that the Unified Code of Corrections is applicable to this case. Aggravated assault prior to January, 1973, was treated both as a misdemeanor (4 days to 1 year) and a felony (1 to 5 years). It is now a Class A misdemeanor (less than 1 year) (Ill. Rev. Stat. 1973, ch. 38, par. 12—2). Armed robbery carried a minimum penalty of 5 years for the first offense and 8 years for a subsequent conviction. It is now a Class 1 felony (4 years minimum) (Ill. Rev. Stat. 1973, ch. 38, par. 18—2). The trial judge commented at sentencing that he was giving the minimum sentence available under the statute, defendant having a prior conviction. The record indicates that the defendant was 21 years of age at the time of the offense with no stable background of employment and that he had two prior convictions—one in 1968 for unlawful use of a weapon (fine and 6 months' probation) and another in 1968 for armed robbery (5 years' probation). He was arrested in 1969 for aggravated battery (firing shotgun and injuring two people). He was not prosecuted for this offense but his probation was revoked and he was sentenced to 2 to 7 years. He was paroled in April, 1971, and the present offense occurred in February, 1972. His record to date shows a history of the use of firearms and disregard for human safety. The defendant also contends that his sentence is grossly disparate with that given his co-defendant. It is true that this court has reduced such disparate sentences where the background and participation in the offense were substantially the same. (*People v. Tobin*, 2 Ill. App.3d 538; *People v. Cherry*, 130 Ill.App.2d 965.) The record indicates that the co-defendant entered a plea of guilty and received a sentence from 2 to 3 years. The record, however, contains no evidence of co-defendant's background or past criminal record. In addition, there is no evidence that the co-defendant fired at the police officers; in fact, he denied it in his testimony.

■■ The issue of reducing disparate sentences of defendants who go to trial rather than plead guilty is to prevent "punishment" by the court for the exercise of a right to jury trial. (*People v. Cherry, supra; People v. Moriarty*, 25 Ill.2d 565.) "Punishment" does not appear here. As noted above, the trial court imposed the minimum sentence available at that time for armed robbery. In addition, this is not a case where the trial judge expresses prejudice toward the defendant for forcing the State to

its proof before a jury. Defendant knew of his prior conviction and undoubtedly had been told by his counsel of the mandatory 8-year minimum if he was found guilty. Defendant's conduct and history in this case are serious enough to warrant the sentence imposed by the trial court. However, as the defendant must be resentenced on the aggravated assault count, the court at that time may take into consideration whether a minimum term of greater than 4 years for armed robbery is required.

The judgment of the trial court of St. Clair County is affirmed subject to a remand for resentencing on the aggravated assault count.

Judgment affirmed and remanded.

G. MORAN, P. J., and EBERSPACHER, J., concur.