(No. 43851.—

THE PEOPLE OF THE STATE OF ILLINOIS, Appellee,
v. JOHN LEE PATRICK, Appellant.

*Opinion filed November 30, 1972.*

GERALD W. GETTY, Public Defender, of Chicago (ROBERT M. GRAY and JAMES N. GRAMENOS, Assistant Public Defenders, of counsel), for appellant.

WILLIAM J. SCOTT, Attorney General, of Springfield, and EDWARD V. HANRAHAN, State's Attorney, of Chicago (JAMES B. ZAGEL, Assistant Attorney General, and ELMER C. KISSANE and JAMES N. KARAHALIOS, Assistant State's Attorneys, of counsel), for the People.

MR. JUSTICE SCHAEFER delivered the opinion of the court:

After a bench trial in the circuit court of Cook County, the defendant, John Lee Patrick, was found guilty of armed robbery and aggravated battery, and was sentenced to concurrent terms of two to five years and one to five years, respectively, in the penitentiary. The case is here upon direct appeal.

Mrs. Hattie Floyd testified that at approximately 9 P.M. on January 3, 1968, she was waiting for a bus on the corner of Roosevelt Road and Halsted Street in Chicago on her way home from work. A youth approached, stood looking at her for "about two minutes," then struck her on the head with a gun and said, "Bitch, I am going to kill you," put the gun to her back and made her walk in front of him approximately two blocks to a three-story apartment building located at 1213 South Peoria Street. They entered the basement of the building and walked upstairs to a vacant, second-floor apartment, where the youth robbed her and ordered her to disrobe. A scuffle ensued, during which she attempted to stab him with a knife she

carried, but was herself stabbed several times with her own knife. When the struggle ended, the youth again demanded that she disrobe; he also demanded that she perform an act of oral copulation on him. She removed her clothes, but when she refused to perform the indecent act, he struck her with the gun and knocked her unconscious. She testified that when she regained consciousness she was standing against the wall, fully clothed, although her clothes were on inside out, and the youth was slapping her in the face. He then began to lead her to the basement. As they were walking down the stairs, both fell, police officers arrived, and the youth escaped.

Mrs. Floyd, a Negro, described her assailant to the police as a Negro, 17 or 18 years old, with a complexion a little darker than her own, about 130 pounds, with large eyes. She was not sure whether his hair was processed. She said that the youth was a bit shorter than her 5 feet 5 inches and stated that he was wearing a black leather jacket, black pants, black shoes, and a light shirt.

About a week after the incident Detective Wayne White went to the victim's home with a group of photographs of robbery offenders. She examined the pictures, but could not make an identification. She did, however, furnish Detective White with a description of her attacker which matched that of a young man known as "Running Bear." The defendant's nickname was "Running Bear." The detective then obtained a photograph of the defendant from police files and took it, along with a group of photographs which included six that had not been included in the first group. After examining the entire group she told the detective that she had recognized one of the photographs as that of her assailant. She then picked out the photograph of the defendant as the person who had robbed and beaten her.

Detective White arrested the defendant about 11:30 P.M. on January 26, 1968, in a restaurant, and took him to a police station. He telephoned the victim and asked her to

come to the police station to see a fellow whom he had arrested. He then picked her up at her home and drove her to the police station. As they were climbing the station-house stairs to a second floor office, Mrs. Floyd saw the defendant with his hands cuffed behind his back, accompanied by an armed officer, at the head of the stairs. She immediately told Detective White that that was the man who had attacked her.

The defendant's cousin, Mrs. Willie Jimerson, testified that the defendant had lived with her and her husband, their son and a third youth in the apartment directly across the hall from the vacant apartment where the attack took place, for almost a year preceding the date of the attack. She also testified that the defendant had spent that entire evening at home, and that both the first and third floor apartments were occupied at that time. She testified that on the day of the offense the defendant did not own a black leather jacket; the only coat he owned was a gray car coat which he had worn when he had gone to court on the morning of January 3, 1968. She said the defendant's hair was not processed at the time of the offense, and that the basement of the building was always flooded.

The defendant testified that on the night in question his hair was short and straight. He further stated that he did not own or borrow a black leather jacket on the day of the offense and that his clothing was loud. He testified that the basement of the building at 1213-15 South Peoria Street could not be reached from the inside of the building, and that it was always flooded. In addition, he testified that a few days after January 3, 1968, Detective White's partner took him down to the police station to examine his body for recent scars or bruises and that when none were found, he was released.

The parties stipulated that if Mrs. Lillian Graham were present she would testify that on January 3, 1968, she occupied the first-floor apartment at 1215 South Peoria Street, and that on that date she saw the police arrive at

the building next door and then leave with a Negro woman, after which she saw a man wearing a brown hat and brown topcoat and "acting peculiarly" leave through the front entrance of 1213 South Peoria Street.

The trial judge found the defendant guilty of armed robbery and aggravated battery.

The defendant contends on appeal that the trial court erred in permitting the victim to identify him at the trial. He first asserts that he was denied his sixth amendment right to counsel at the station-house identification, relying on *United States v. Wade (1967), 388 U.S. 218, 18 L. Ed. 2d 1149, 87 S. Ct. 1926,* and *Gilbert v. California (1967), 388 U.S. 263, 18 L. Ed. 2d 1178, 87 S. Ct. 1951.* That identification, however, took place before the defendant had been indicted, and under the decisions of this court (see *People v. Palmer (1969), 41 Ill.2d 571; People v. Cesarz (1969), 44 Ill.2d 180)* and the decision of the Supreme Court of the United States in *Kirby v. Illinois (1972), 406 U.S. 682, 32 L. Ed. 2d 411, 92 S. Ct. 1877,* the constitutional right to counsel does not apply at that point.

The defendant also attacks Mrs. Floyd's in-court identification on the ground that her pretrial identification of the defendant, which took place in the police station after midnight while he was handcuffed and in the custody of a police officer, was so unnecessarily suggestive and conducive to irreparable mistaken identification as to deny him due process of law. See *Stovall v. Denno (1967), 388 U.S. 293, 18 L. Ed. 2d 1199, 87 S. Ct. 1967; People v. Blumenshine (1969), 42 Ill.2d 508.*

As this court observed in *Blumenshine* (42 Ill.2d at 512): "A showing by police of a suspect standing alone, in what is often described as a 'show-up,' has been observed to carry with it a dangerous degree of improper suggestion. *** In *Stovall,* the Supreme Court stated that 'The practice of showing suspects singly to persons for the purpose of identification, and not as part of a lineup, has

been widely condemned.' (388 U.S. at 302, 18 L. Ed. 2d at 1206.)" In spite of these judicial condemnations, confrontations of the kind that took place here continue to occur.

In the present case the State contends that the station-house confrontation between the defendant and Mrs. Floyd was not prearranged, yet Detective White admitted that the police planned to exhibit the defendant alone to Mrs. Floyd and that they did not intend to have a lineup. He testified that he did not tell the defendant that he had a right to have a lawyer present at the lineup because there was not going to be any lineup.

To say that the pretrial identification confrontation was improperly and unnecessarily suggestive does not, however, require a holding that the trial court erred in permitting the witness to make an in-court identification of the defendant. Such an identification is permissible despite a tainted pretrial confrontation if it has an origin independent of the tainted pretrial identification. (*People v. Blumenshine (1969), 42 Ill.2d 508.*) In the present case it is clear that the in-court identification of the defendant by Mrs. Floyd was not based on the brief encounter at the police station, but rather was based on her observation of him during the lengthy period that she was held captive. She testified that her assailant made no attempt to hide his face during the entire incident and that, except for the brief time that she was unconscious, she was able to observe his face during the entire period. When her attacker first approached her at the bus stop she observed his features from a distance of approximately one foot, under good lighting conditions. And although the apartment itself had no lights, she indicated that once her eyes got accustomed to the darkness she could see his face clearly. Under these circumstances we cannot say that the defendant was deprived of due process of law by the in-court identification of him by Mrs. Floyd.

The defendant's final contention is that he was not

proved guilty beyond a reasonable doubt. Although there were several inconsistencies between Mrs. Floyd's testimony at the hearing on the motion to suppress and her testimony at the trial, it must be remembered that the trial was held more than a year after the hearing on the motion to suppress and more than two and one-half years after the crime took place. When viewed in this light the inconsistencies in her testimony as to the exact sequence of events appear minor.

The defendant points out that although Mrs. Floyd testified that she struck at her assailant with a knife, he had no fresh scars or bruises on his body when examined by the police one week after the occurrence. An examination of the record, however, shows that she testified that her knife was not sharp and that she had been unable to cut her assailant with it. In our opinion the trial judge did not err in deciding that the defendant's guilt was established beyond a reasonable doubt.

The judgment of the circuit court of Cook County is affirmed. *Judgment affirmed.*