(No. 44031.—

THE PEOPLE OF THE STATE OF ILLINOIS, Appellee,
v. JEROME WILLIAMS, Appellant.

*Opinion filed January 30, 1975.*

2

Èarl L. Washington, of Chicago, and James Geis, Deputy Defender, and Robert Agostinelli, Assistant Appellate Defender, Office of State Appellate Defender, of Ottawa, for appellant.

William J. Scott, Attorney General, of Springfield (James B. Zagel and Donald Hubert, Assistant Attorneys General, of Chicago, of counsel), for the People.

MR. CHIEF JUSTICE UNDERWOOD delivered the opinion of the court:

The defendant, Jerome Williams, was indicted by a Will County grand jury for burglary, armed robbery, murder and felony-murder. A jury returned guilty verdicts on all counts. The trial judge sentenced Williams to serve concurrent terms of 10 to 20 years for burglary and 20 to 40 years for armed robbery, and imposed an additional term of 75 to 100 years for murder, to be served consecutively to the terms for burglary and armed robbery.

In seeking reversal defendant contends that: (1) Improper identification procedures were utilized by police; (2) prejudicial error was committed when the trial judge allowed into evidence an inflammatory and irrelevant photograph of the dead body of the murder victim; (3) his

guilt was not proved beyond a reasonable doubt; (4) the trial judge erred by refusing to respond to questions asked of him by the jury during its deliberations; and (5) the sentences imposed by the trial judge were improper and excessive.

At approximately 11 p.m. on the evening of May 4, 1970, two men, pretending to have car trouble, forced their way into the home of Joseph and Helen Calderone when Mr. Calderone opened the front door. Immediately upon their entry, a scuffle ensued and Mr. Calderone, who carried an unloaded revolver, was shot in the head and killed by one of the men. Mrs. Calderone had been sleeping in the bedroom, but awakened shortly before the shooting to find her husband sitting on the edge of his bed, dressed in pajama bottoms and a robe. The doorbell had apparently rung and after a few words with his wife, Mr. Calderone left to answer the front door, where he commenced a conversation with someone at the door. Mrs. Calderone could hear her husband's voice clearly, but the other voices were muffled as if the door was still closed. She asked who was at the door, and he replied that some people were having car trouble. She heard him tell them that he would telephone a service station, but she called to him that he probably wouldn't find a station open at that hour of the night. Instead of calling a gas station, he returned to the bedroom where she observed him put on his trousers over his pajama bottoms, tuck his robe into his trousers, take a gun from a dresser drawer and leave again to open the front door. She then heard the scuffle and a loud popping noise and started to leave the bedroom to investigate, but was confronted in the hallway by a tall, thin black man who ordered her back to the bedroom. The tall man and a second black man, who was shorter and heavier, then entered the bedroom and questioned her about the location of the telephone. After learning that it was in the kitchen, both men left the bedroom and apparently, in light of the sounds heard by Mrs. Calderone and the

subsequent condition of the phone, went to the kitchen and pulled out the cord, disconnecting the phone. In a short time, they returned to the bedroom and the tall man pointed a gun at Mrs. Calderone, demanding to know where the rest of their money was located. She informed them that her purse was in the living room and both men again left the bedroom for a few minutes, but soon returned for a third time. At the direction of the tall man, Mrs. Calderone turned on her side and he then bound her hands and feet with wire and placed a piece of adhesive tape across her mouth. The men left the Calderone home shortly thereafter, taking a typewriter, $200 from Mr. Calderone's money clip, Mrs. Calderone's purse containing about $25, a color television, and the revolver which Mr. Calderone had carried to the front door. Mrs. Calderone estimated that the men were present in the house for about 15 minutes and were actually in her presence for about one-half that time. There was no light on in the bedroom, but she was able to see the assailants due to illumination provided by lights in the bathroom and hallway which both adjoined the bedroom. The Calderone's son was at home at the time of the crime, but was asleep in his own room.

Shortly after the crime, Mrs. Calderone gave a description of the two assailants to police officers. She described the man with the gun as a very tall, thin black male, wearing a hat with a narrow brim, sunglasses, a gray jacket and pants. She added that he spoke quite clearly and that she had seen his ears, the general shape of his face and his hair line, indicating that his hair was short and cropped close to his head. She made no mention of a moustache.

The defendant was arrested on May 20, 1970, in the company of another black man named Leroy Watts. Later that day two deputy sheriffs went to see Mrs. Calderone and showed her eight photographs, each containing several views of a black male. They asked her not to look at the

backs of the photographs, but made no other comments regarding the photographs or the men shown in them. Four of the photographs were of different unidentified black males. A fifth was a photograph of Leroy Watts, and the remaining three were of the defendant. One of these three was a black-and-white shot showing a side and a front view of the defendant's head and upper body, with the defendant wearing a narrow-brimmed hat and sunglasses. Another black-and-white photo showed similar views of the defendant, dressed in the same clothes, but without the hat and sunglasses. The third photograph of the defendant was a color shot of him wearing different clothes than in the two black-and-white photographs. It showed a side and a front view of his head and upper body and also a frontal view of his entire body standing next to a height marker which revealed that he was several inches taller than six feet. Mrs. Calderone picked out all three photographs of the defendant as a picture of the tall man with the gun who had entered her house on May 4, 1970. She was unable to identify any of the other five men in the photographs as the second assailant. The police immediately took Mrs. Calderone to the station to view a lineup, without telling her that the man she had just identified was presently in custody or that he would be in the lineup. The defendant was in fact the third man in the lineup, and when he turned toward Mrs. Calderone, she pointed toward him and fainted. After being revived, she positively identified the defendant as the tall assailant with a gun.

After hearing evidence of this entire procedure outside the presence of the jury, the trial judge denied a motion to suppress the identification testimony of Mrs. Calderone. She then related the same story to the jury and made a positive in-court identification of the defendant, who had shaven off the moustache he had worn in the photographs and at the lineup. In addition to Mrs. Calderone's identification, the other significant evidence against defendant was the testimony of fingerprint experts establishing

that defendant's thumbprint had been lifted from the cover of a role of adhesive tape found in the Calderone bedroom immediately after the crime.

The defendant presented an alibi defense, which was directly supported by the testimony of a girl friend who claimed to have been with the defendant at the time of the crime, and partially corroborated by the testimony of his foster mother. He attempted to explain his fingerprint on the adhesive-tape cover by relating an incident—allegedly occurring several days prior to the date of the crime—in which he had attempted to help Leroy Watts repair the tape deck in his automobile. While searching for a screwdriver in Watts's glove compartment, defendant claimed that he touched several other items, including an adhesive-tape dispenser. The clear implication of this testimony was that defendant's thumbprint was placed on the cover at that time and that Watts—who must, therefore, have been the tall robber with the gun—had taken the tape with him to the Calderone home, leaving it there after taping the mouth of Mrs. Calderone. Although several inches shorter than the defendant, Watts was also slender and somewhat similar in appearance to him. The defendant, however, presented no corroborating evidence to support his story about being in Watts's car or his contention that Watts had participated in the crime. Moreover, Watts's photograph was among the eight viewed by Mrs. Calderone on May 20, and he was also in the lineup viewed by her on the same day, yet she failed to identify him while positively identifying defendant from the photographs and the lineup, as well as in the courtroom.

Defendant contends that Mrs. Calderone's identification testimony at trial should have been ruled inadmissible because her lineup and in-court identifications were tainted by improper photographic identification procedures and were unsupported by any origin independent of the photographic identification. Defendant's initial

argument on this issue is that our previous decisions in *People v. Holiday* (1970), 47 Ill.2d 300, and *People v. Jackson* (1973), 54 Ill.2d 143, precluded the police from using any photographic identification procedure at all because the defendant was already in custody at the time Mrs. Calderone was shown the eight photographs on May 20. In those cases, we said that "photographic identification procedures ought not to be employed when the suspect is in custody and a lineup is otherwise feasible" (47 Ill.2d at 307) unless the police can offer extenuating circumstances justifying the use of a photographic identification.

We believe that such extenuating circumstances existed in this case and that the police were therefore justified in showing Mrs. Calderone photographs of the defendant prior to a lineup. First, it is clear from the record that Mrs. Calderone·had undergone surgery for cancer and was still in such poor health on May 20, 1970, that a trip outside her home caused her considerable discomfort. The police acted reasonably by utilizing a preliminary photographic identification before subjecting Mrs. Calderone to a trip to the station that might have proved fruitless and served only to aggravate her condition. Moreover, the defendant was not in custody as a suspect in this case. Rather, it seems that, once in custody, his resemblance to the description previously obtained from Mrs. Calderone prompted the police to include his photograph among those shown to Mrs. Calderone on the evening of May 20. She had previously been shown more than 70 photographs of black males, but had been unable to identify either of the robbers. Thus the police were merely showing her additional photographs in an attempt to initially identify a suspect in a case in which they had not yet uncovered any significant leads.

Defendant next argues that the photographic identification procedure actually used in this case was impermissibly suggestive because three of the eight photographs

were of him and also because the only photograph showing a man wearing a hat and sunglasses was of him. We agree that the use of multiple, identical or obviously similar, photographs of the same person is normally an undesirable photographic identification procedure which may often be unduly suggestive. However, the three photographs of this defendant were so dissimilar that it is not readily apparent that they are photographs of the same man. If Mrs. Calderone's identification was weak and based primarily on the hat and sunglasses, she might well have picked out only the photograph showing defendant in a hat and sunglasses, without recognizing that he was also the man in two of the other photographs. The police appear to have used care to avoid conveying the impression that any of the men in the photographs were actually suspects in the case or were presently being held in custody. We agree with the State that this particular procedure was not suggestive, but the contrary might well be true had the photographs been more nearly alike.

Moreover, even if we assume that no photographic identification procedure should have been used or that the one actually used here was suggestive, we believe that the identification testimony of Mrs. Calderone would still have been admissible at the trial. As we stated in *Holiday* and *Jackson,* in order to determine the effect of improper or suggestive photographic identification procedures, this court will scrutinize the totality of circumstances surrounding the photographic identification according to the standards set by the United States Supreme Court in *Simmons v. United States* (1968), 390 U.S. 377, 19 L. Ed. 2d 1247, 88 S. Ct. 967: "*** each case must be considered on its own facts, and *** convictions based on eyewitness identification at trial following a pre-trial identification by photograph will be set aside on that ground only if the photographic identification procedure was so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification."

(390 U.S. at 384, 19 L. Ed. 2d at 1253, 88 S. Ct. at 971.) The totality of circumstances in this case convinces us that any possible suggestiveness or impropriety in the photographic identification procedure could not have resulted in "irreparable misidentification" because the identification testimony of Mrs. Calderone was based on an origin sufficiently independent of the photographic identification. She had an opportunity to observe the tall robber for over seven minutes at distances of just a few feet. Her initial observation of him was a side view as he stood in the lighted hallway. The remainder of her observations occurred in the bedroom which was dimly but adequately illuminated by lights in the adjoining bathroom and hallway. Her description of the defendant was accurate except for her failure to mention a moustache, which we do not consider crucial, especially since the defendant could have been clean-shaven at the time of the crime and simply grown a moustache during the 16 days between the commission of the crime and his arrest. A full evidentiary hearing was held by the trial judge on the motion to suppress the identification testimony before he ruled that it was admissible. Both at this hearing and at trial, defense counsel cross-examined Mrs. Calderone at length, having ample opportunity to reveal any weaknesses in her identification. Throughout this extensive cross-examination, she remained sure that her identification was based on her memory of the night of the crime and not on the photographs she had viewed on May 20. The photographic and lineup identifications occurred just 16 days after the crime, when her memory would still have been fresh, and all three identifications were made positively and without hesitation. Considering all these facts, we find that her identification had an independent origin and that the "photographic identification procedure was [therefore not] so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification." The trial judge correctly ruled that Mrs. Calderone's

identification testimony was admissible.

During the trial, the State was allowed to introduce in evidence a photograph of the dead body of Mr. Calderone taken shortly after the crime and before his body had been moved. Defendant contends that the photograph is gruesome and inflammatory and should not have been admitted since it was irrelevant to the issues involved in the trial. "Whether a photograph of a deceased person should be admitted in evidence normally rests within the discretion of the trial court and if such a picture has sufficient probative value it may be admitted in spite of the fact that the photograph may be gruesome and inflammatory." (*People v. Lefler* (1967), 38 Ill.2d 216, 221.) Although the scene portrayed by the photograph was unpleasant, the location and position of the body as shown by it corroborate the evidence that Mr. Calderone was shot by the robbers just as he opened the front door. In our judgment the court did not err in admitting it.

We find no merit in defendant's argument that his guilt was not proved beyond a reasonable doubt. His conviction was based on a positive identification by Mrs. Calderone and unrebutted evidence that his thumbprint was found on the adhesive-tape cover. It was for the jury to judge the credibility of the defendant's alibi and his explanation of the presence of his thumbprint on the tape cover. The verdict indicates that they did not consider this testimony credible, but instead accepted the State's evidence as the truth. A positive identification by a single witness with ample opportunity to observe is sufficient to support a conviction. (*People v. Clarke* (1971), 50 Ill.2d 104, 110.) In this case, with such an identification being supplemented by relevant and damaging fingerprint evidence, the defendant was clearly proved guilty beyond a reasonable doubt.

During its deliberations, the jury sent the trial judge a note containing three questions: "(1) Did the inside of the tape cover get fingerprinted (exhibit 6A Tape Dispenser

Cover)? (2) Why was not the window sill in the Calderone bedroom dusted for fingerprints? (3) May we see Officer Brown's report which included Mrs. Calderone's initial description of the tall intruder?" The trial judge responded with a note stating: "You must reach your verdict on the evidence which has been presented to you. /s/ Michael A. Orenic, Judge." Defendant argues that our recent decisions in *People v. Queen* (1974), 56 Ill.2d 560, and *People v. Pierce* (1974), 56 Ill.2d 361, are controlling here and that the trial judge either failed to exercise his discretion or—if he, in fact, exercised his discretion—abused that discretion by his failure to answer the questions. We do not agree that *Queen* and *Pierce* are applicable since the jury was not requesting a review of testimony or evidence in the case. Instead, the first two questions requested the judge to respond with a conclusion based on his own evaluation of the evidence and the third question requested permission to view a report that was never admitted in evidence. Defendant incorrectly suggests that these questions should be interpreted as requests to review any testimony relating to the subject matter of the questions. Rather, such questions from the jury should be literally construed to mean just what they say, and these particular questions clearly are requests for information which the trial judge had no discretion to provide. He therefore could not have abused or failed to exercise discretion which he did not even possess, and consequently his reply to the jury was entirely proper.

Beginning with *People v. Schlenger* (1958), 13 Ill.2d 63, this court has decided a series of cases culminating in holdings that a person may not be convicted of multiple offenses arising out of the same act or the same conduct and that only the judgment and sentence for the most serious of the offenses may stand. (See also *People v. Duszkewycz* (1963), 27 Ill.2d 257; *People v. Stewart* (1970), 45 Ill.2d 310; *People v. Whittington* (1970), 46 Ill.2d 405; *People v. Lerch* (1972), 52 Ill.2d 78; *People v.*

*Prim* (1972), 53 Ill.2d 62; *People v. Cox* (1972), 53 Ill.2d 101; *People v. Lilly* (1974), 56 Ill.2d 493; *People v. Scott* (1974), 57 Ill.2d 353.) Defendant contends that these cases are applicable to his multiple convictions and that only the conviction of murder, the most serious of the offenses, may stand. We find instead that these decisions affect only the convictions of burglary and armed robbery. The two men entered the Calderone home for the purpose of robbing the Calderones. Thus, although burglary and armed robbery involve different elements of proof and the men commited a series of acts, their unauthorized entry with the intent to commit theft and the actual theft by means of armed robbery constitute two offenses arising from the same conduct involved in robbing the Calderones. Only the conviction of the most serious of the two offenses, armed robbery, can stand, and the judgment and sentence on the burglary conviction must be reversed.

These cases do not, however, prohibit separate convictions and sentences for armed robbery and murder, even though the activity constituting both offenses was a series of very closely related acts. The purpose of the entry was robbery, not murder, and that objective changed to murder only when the robbers were confronted by Mr. Calderone with a gun in his hand. Then, they chose to commit a separate act for the purpose of killing Mr. Calderone. That shooting can be viewed as a means of removing an obstacle to their original objective of robbery, but it is also evident that at least part of their reason for killing was to avoid injury or apprehension by Mr. Calderone. We believe that such a situation is controlled by our decision in *People v. Johnson* (1970), 44 Ill.2d 463, in which we held that the convictions and sentences for burglary and rape were proper. As we stated in *Johnson*, cases such as *Schlenger* "were not intended to cover situations in which more than one offense arises from a series of closely related acts and the crimes are clearly distinct and require different elements of proof." (44

Ill.2d at 475; see also *People v. Raby* (1968), 40 Ill.2d 392; *People v. Harper* (1972), 50 Ill.2d 296.) The convictions and sentences imposed upon the defendant for murder and armed robbery may both stand.

Defendant contends that, even if more than one conviction is proper, the sentence for murder may not be consecutive. Defendant's argument on this point is based only on section 5—8—4(a) of the Unified Code of Corrections, which he views as more favorable to him than the statutory provisions in effect at the time he was sentenced. The latter were found in section 1—7(m) of the Criminal Code of 1961, which authorized consecutive sentences when the offenses "did not result from the same conduct." (Ill. Rev. Stat. 1969, ch. 38, par. 1—7(m).) Section 5—8—4(a) of the Unified Code of Corrections, which became effective during the pendency of this appeal, reads:

> "The court shall not impose consecutive sentences for offenses which were committed as part of a single course of conduct during which there was no substantial change in the nature of the criminal objective." Ill. Rev. Stat., 1972 Supp., ch. 38, par. 1005—8—4(a).

As later indicated, defendant, while in the process of direct appeal, is entitled to the benefit of favorable provisions of the Unified Code of Corrections, and we shall consider his argument in that context. However, as we earlier noted, the purpose of the robbers shifted, at least partially, at the time they shot Mr. Calderone, and we believe, after considering the events at the Calderone home in their entirety, that the act of killing Mr. Calderone was sufficient not only to establish the existence of a "substantial change in the nature of the criminal objective," but also to constitute a departure from a "single course of conduct." We hold therefore that section 5—8—4(a) is inapplicable and the consecutive sentence for murder was proper.

Defendant wrongly asserts that the wording of the

sentences leaves doubt as to what sentence the judge actually intended to impose. In our view the wording is subject to just óne interpretation—the defendant was to serve 10 to 20 years for burglary, 20 to 40 years for armed robbery and 75 to 100 years for murder. *People v. Jackson* (1948), 399 Ill. 488, cited by defendant, involved very ambiguous language imposing two entirely different sentences and is simply not applicable here. Additionally, we find no merit in defendant's final contention that these sentences were excessive. The nature of the crimes was sufficient justification for the imposition of sentences far in excess of the allowable minimum.

While defendant has not questioned the sentences except as earlier indicated, we believe, for reasons other than those argued, that the consecutive sentence with a 75-year minimum cannot stand. The Unified Code of Corrections was adopted and became effective on January 1, 1973, while this case was in the appellate process. Section 5—8—4(c) thereof provided: "The aggregate minimum period of consecutive sentences shall not exceed twice the lowest minimum term authorized under Section 5—8—1 for the most serious felony involved." (Ill. Rev. Stat., 1972 Supp., ch. 38, par. 1005—8—4(c).) Since section 5—8—1 then provided a minimum term of 14 years for murder "unless the court, having regard to the nature and circumstances of the offense and the history and character of the defendant, sets a higher minimum term," the aggregate minimum period of consecutive sentences could not exceed 28 years. Section 5—8—4(c) has since been modified so that the sentences imposed here would now be within the permissible range. We have held, however, that the legislative intent was to apply the sentencing provisions of the Unified Code to those cases pending on appeal (*People v. Morgan* (1974), 59 Ill.2d 276; *People ex rel. Weaver v. Longo* (1974), 57 Ill.2d 67; *People v. Chupich* (1973), 53 Ill.2d 572; *People v. Harvey* (1973), 53 Ill.2d 585), and that where, as here, sentencing provisions in

effect at the time sentence was imposed and at the time the appeal is decided are less favorable to a defendant than provisions enacted after sentence was imposed, and then repealed before the appeal was decided, the defendant is entitled to the benefit of the more favorable intervening statute. It is apparent, therefore, that the 75-year-minimum sentence cannot stand if the murder sentence remains consecutive to the armed-robbery charge.

We accordingly reverse the judgment of the Will County circuit court on the burglary charge. We affirm the judgments on the murder and armed-robbery charges, and remand for sentencing in accordance with the views herein expressed.

*Affirmed in part and reversed in part and remanded, with directions.*