THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.* BERNARD GLAZE, a/k/a Bernard Connerson, Defendant-Appellant.

First District (5th Division)    No. 62853

Opinion filed April 22, 1977.

James J. Doherty, Public Defender, of Chicago (Michael E. Jackson and John M. Kalnins, Assistant Public Defenders, of counsel), for appellant.

Bernard Carey, State's Attorney, of Chicago (Laurence J. Bolon and Larry L. Thompson, Assistant State's Attorneys, of counsel), for the People.

Mr. JUSTICE WILSON delivered the opinion of the court:

Defendant was indicted for the crimes of armed robbery, aggravated battery and attempt rape. Following a bench trial, defendant was convicted of armed robbery and aggravated battery of Robbie Parker (Ill. Rev. Stat. 1973, ch. 38, pars. 18—2, 12—4) and sentenced to a term of 4 to 8 years for armed robbery. On appeal he contends that (1) the pretrial identification procedures were so suggestive as to give rise to a substantial likelihood of misidentification so as to deny him due process of law; (2) he was not proved guilty of armed robbery and aggravated battery beyond a reasonable doubt; and (3) he cannot be convicted for two offenses derived from the same act.

We affirm.

Before trial, defendant filed a motion to suppress in-court identifications by the witness, Robbie Parker. He alleged that her identification was induced by the actions of the police and was grossly suggestive and deprived him of due process of law.

The following pertinent evidence was heard on the motion to suppress. Robbie Parker testified that on April 8, 1974 about 1:30 in the morning she got off a bus at 49th Street and Cottage Grove Avenue in Chicago, Illinois, and was walking west on 49th Street between Evans and Langley Streets. She was accosted by defendant who approached her from behind and attacked her with a knife. After he attacked and robbed her, he forced her into an alley and got on top of her. She saw the police pull into the alley and defendant ran. Police officers caught defendant and brought him back to about five feet of the squad car in which she was sitting. They asked her if he was "the man." She answered "yes."

After she identified defendant, she was taken to the hospital and then to the police station at 51st Street and Wentworth. While at the police station, she viewed a lineup of five men and picked out defendant.

She further testified that when she saw defendant outside the squad car he was wearing the same clothing he had on when he attacked her. He had on a blue Levi jacket, plaid pants and a blue hood over his head. She was not shown any photographs before viewing the lineup and was told by a police officer to identify from the lineup the person who attacked her.

John Farrell, a Chicago police officer:

On April 8, 1974, he arrested defendant, and transported him to 4852 South Evans Street, Chicago, Illinois. He had seen a man running from an alley at 4852 South Evans where a woman was calling for help. He and his partner had chased the man on foot and lost him. He got back into his squad car and began to search the area. He heard a description of the assailant on the radio. He stopped defendant because his clothes fit the description received over the radio. Defendant was wearing white and brown checked pants, blue hood and a Levi jacket. Defendant could not produce any identification and a knife and an umbrella was found in his possession.

After taking defendant back to the alley at 4852 South Evans, Farrell had defendant stand outside of his squad car. Neither the officer nor the defendant talked to anyone at that time.

On cross-examination Farrell testified that when his vehicle pulled into the alley he saw the assailant get off the victim and run northbound in the alley. The attacker had on a blue Levi jacket, hood and brown and white checked pants. He and his partner chased the assailant about one half block up the alley and then lost sight of him. After receiving a description

over the radio, Farrell observed defendant at 47th Street and Champlain, placed him under arrest, and put handcuffs on him. He also stated that at the time defendant stood outside the squad car the street lights, alley lights and squad car vehicle lights were on. Furthermore, defendant was taken outside the vehicle in order that Mrs. Parker could view him and determine whether he was her attacker. If she had failed to identify him, Farrell stated, he would have been released and the officers would have continued the search for her assailant. Farrell was present at the lineup and saw the victim identify defendant.

The motion to suppress was denied and the following pertinent evidence was adduced at trial.

### FOR THE STATE

Robbie Parker testified that on April 8, 1974, at approximately 1:30 in the morning, she exited a bus at 49th Street and Cottage Grove in Chicago, Illinois. She was returning home from working a shift at the Chicago Post Office. While walking west on 49th Street, she looked behind her and noticed defendant a half block away on the corner of Evans and 49th Streets. As she proceeded under a street light at an alley between Evans and Langley Streets, defendant approached her from the rear and said "Turn off cool tonight." Before she could give a response, defendant placed a brown-handled linoleum knife around her neck and said, "Give me the money." She replied that she had no money and defendant stepped in front of her and stood one foot away from her. Defendant then cut her on the left cheek and he said, "This is to let you know I mean business." After he cut her, he said "You don't have any money? So give me your watch." Defendant ripped her watch off her left arm. During this time she was facing defendant and his face was about one foot away from her. The lighting was good. She screamed and he punched her twice and knocked her down. After she got up from the ground, defendant said, "Well if you do what I tell you to do, you won't get hurt." She replied "I don't know what you want me to do because I don't have any money." During this conversation she noticed that defendant had a heavy moustache, sideburns, and whiskers around his chin. She saw that he was a male Negro about six feet tall and that he wore a blue Navy jacket, a dark hooded jacket and white plaid, dark checked pants. He forced her into the alley and while holding the knife around her neck and told her to pull her slacks off. She removed her slacks and underclothing. He struck her with his fist, knocked her down, and jumped on top of her. He started fumbling around the waistband of his pants. Before he could proceed any further, police officers came into the southern end of the alley. He jumped up and ran north in the alley. Mrs.

Parker was helped to her feet by police officers from one squad car. Officers from another squad car chased defendant. She dressed in a police squad car and remained there. While sitting in the police car, the other police officers returned with defendant. One of them asked her if defendant was the same man who attacked her. At this time, defendant was standing about five feet from the squad car in which she was sitting. She identified him as her assailant. Approximately, five minutes had passed from the time he ran north in the alley until she identified him while he was standing outside the police car. After receiving medical treatment at Provident Hospital, she went to the 51st and Wentworth Police Station where she identified defendant from a five-man lineup.

On cross-examination, Mrs. Parker stated that she was not wearing eyeglasses the night she was attacked but that she had her glasses with her that day. She testified that after defendant cut her on the left cheek she bled heavily. She further stated that after he struck her on the left side of her face her left eye swelled but that she could see out of it until the next morning.

During her redirect examination, she acknowledged that the police officers did not ask her for a description of defendant until after she identified him.

John Farrell, a Chicago police officer, testified that on the morning of the incident he was on patrol in a marked squad car driven by his partner, Tom Scott. He and Scott responded to a radio broadcast announcing that a woman was calling for help at 4852 South Evans in the alley. They arrived at the location and pulled into the alley. Farrell saw a male Negro get up off a woman and run northbound in the alley. Farrell left the squad car and began running after the man for one half block. He observed the assailant from a distance of 80-90 feet for approximately 30-60 seconds. He testified that the attacker was wearing brown and white checked pants, blue Levi jacket and a dark blue hood. After losing sight of the assailant, he returned to the squad car and he and his partner began a search of the neighborhood. The assailant's description was received over the police radio. While proceeding north on Champlain Street, he observed defendant wearing clothing that resembled the clothing worn by the person he had chased in the alley. He left the squad car, ordered defendant to stop, and asked him for an identification. Defendant was unable to produce any identification. He "patted him down" and found a brown-handled linoleum knife. He also found defendant carrying a pink umbrella. Defendant was placed in the squad car and Farrell read his constitutional rights to him. Defendant was driven back to the scene of the assault, where he was removed from the car and left standing outside of the vehicle for about 10 seconds. He was then put back into the squad

car and transported to the police station. Approximately 3 or 4 minutes elapsed between the time Farrell chased the assailant on foot and the time he returned him to the scene of the assault.

During cross-examination, Farrell admitted signing a "crime against persons report" written by his partner that described defendant as "male Negro approximately 26 to 30 with a blue hooded jacket, blue and white checked pants." He testified that defendant did not appear to be out of breath when he stopped him and that he did not recover a ladies' diamond wrist watch from him. He also testified that he did not look for any blood on defendant's jacket but at the police station observed for the first time a lot of blood on the left side of Mrs. Parker's coat. Finally, he denied making a statement during the grand jury hearing that defendant was wearing a "blue leather coat."

On re-cross-examination, he testified that although his partner was between him and the man they were chasing in the alley, he could see the man. He did not remember whether he saw the assailant carrying an umbrella.

Patrick Bruen, a Chicago police officer, testified for the State. He was working with his partner, Officer John Tobin, between 11 o'clock in the evening and 7:30 in the morning on April 8, 1974. After receiving a radio assignment, he drove a police squad car to the alley between Langley and Evans Streets. When he pulled into the alley he observed a male and female "scuffling on the ground." He described the male as a Negro, wearing a dark navy blue hood, navy blue jean jacket, and dark and white checked pants. When the assailant saw the police cars, he ran north through the alley and Farrell and Scott, from an assisting squad car, chased him on foot. Bruen assisted Mrs. Parker and placed her in the back of the squad car. He then sent out a description of the assailant on the radio. His broadcast described the assailant as a male Negro wearing a blue hood, a blue jean jacket, and dark and white checked pants. Defendant was returned to the scene of the assault by Officers Farrell and Scott. While defendant was outside of the squad car, he was viewed by Mrs. Parker. Bruen asked her whether "she recognized the man." She responded that defendant was her assailant. Defendant was wearing the same clothing that Bruen observed being worn by the person who ran from the alley.

During cross-examination, Bruen admitted that he did not examine defendant's clothing for traces of blood nor did he recall seeing a reddish or pinkish umbrella that night.

Defendant, on his own behalf, testified to the following: He had lived at 4949 Washington Park Court, Chicago, Illinois, for about one month. He had previously lived in Kansas City, Missouri, where he attended Park College in Parkville, Missouri. On the morning in question at about 1:30,

he was at 47th and Champlain. He was on his way home from the Big Track Tavern, which was located in the middle of the block on 47th Street between Langley and Champlain Streets. Previous to arriving at the tavern he had been at his son's mother's house which was located about a block and a half from the tavern. While in the tavern he had talked to a friend but had not had anything to drink. He was carrying a carpet knife in the pocket of the hooded sweater and his mother's umbrella in his hand. At 47th Street and Champlain the police picked him up, handcuffed him, and drove him to 51st Street and Champlain. The police took him out of the squad car and he saw Mrs. Parker sitting in the back seat of another squad car with a bandage on her face. He was dressed in a blue hooded sweater, blue Levi jacket and blue checked pants. There was no blood on his pants or outer jacket. He denied robbing or cutting Mrs. Parker. He did not have a ladies' wrist watch in his possession.

On cross-examination, he testified that he did not have any money when he went into the tavern or when he was arrested, and that he had borrowed the umbrella from his mother.

On redirect examination, he was asked if his mother's name was written on the umbrella. He examined the umbrella and responded that his mother's name "Emma" was on the umbrella. He further testified that he was talking to Mr. Bates, a police officer, in the tavern.

During re-cross-examination, he admitted that he first saw the name "Emma" on the umbrella that day in court.

William B. Auski, a Chicago Board of Education teacher assigned to the Cook County Jail, stated that defendant's reputation in the jail for being truthful and peaceful was "good."

At the close of all the evidence and after argument, the trial court held that the defendant was guilty of armed robbery and aggravated battery beyond "any doubt" not just a reasonable doubt. After a hearing in aggravation and mitigation, the sentence previously stated was imposed.

OPINION

■■ Defendant's initial contention is that the pretrial confrontation wherein defendant was viewed and identified by Mrs. Parker was grossly suggestive, and that the trial court erred in denying defendant's pretrial motion to suppress the identification. We disagree.

The confrontation complained of occurred at the scene of the crime within 5 minutes of the robbery and aggravated battery. Two police officers observed the assailant run from the scene of the crime and each independently described the assailant and his clothing as a Negro wearing plaid pants, blue Levi jacket and dark blue hooded sweatshirt. Defendant, after being arrested 1½ blocks from the alley where the attack

occurred, and discovered to be armed with a knife, was returned to the scene of the crime where he stood under lights emanating from alley lights and police headlights for approximately 10 seconds. Mrs. Parker identified defendant as the man who had attacked her moments earlier; defendant was thereafter transported to the police station. Several hours later, he was placed in a lineup and again identified by Mrs. Parker.

Defendant urges that the nature of this identification procedure was conducive to irreparable mistaken identification of him as a participant in the robbery. Prompt "on the scene" identification procedures were discussed in *People v. Elam* (1972), 50 Ill. 2d 214, 218, 278 N.E.2d 76, where the court repeated its holding that this type of confrontation does not violate the principle announced in *United States v. Wade* (1967), 388 U.S. 218, 18 L. Ed. 2d 1149, 87 S. Ct. 1926; *Gilbert v. California* (1967), 388 U.S. 263, 18 L. Ed. 2d 1178, 87 S. Ct. 1951; and *Stovall v. Denno* (1967), 388 U.S. 293, 18 L. Ed. 2d 1199, 87 S. Ct. 1967. The court in *Elam* quoted language from *Bates v. United States* (D. C. Cir. 1968), 405 F. 2d 1104, 1106, where the court stated:

> "There is no prohibition against a viewing of a suspect alone in what is called a "one-man showup" when this occurs near the time of the alleged criminal act; such a course does not tend to bring about misidentification but rather tends under some circumstances to insure accuracy. The rationale underlying this is in some respects not unlike that which the law relies on to make an exception to the hearsay rule, allowing spontaneous utterances a standing which they would not be given if uttered at a later point in time."

In further discussion of the *Bates* case, the court in *Elam* went on to say:

> "The court further observed that such procedure fosters the desirable objectives of fresh, accurate identifications which may lead to the immediate release of an innocent suspect and at the same time enable the police to resume the search for the fleeing offender while the trail is fresh." (50 Ill. 2d 214, 218.)

See also *People v. Young* (1970), 46 Ill. 2d 82, 87, 263 N.E.2d 72; *People v. McMath* (1968), 104 Ill. App. 2d 302, 314, 244 N.E.2d 330, *affd* (1970), 45 Ill. 2d 33, 36, 256 N.E.2d 835, *cert. denied*, 400 U.S. 846, 27 L. Ed. 2d 83, 91 S. Ct. 92; *People v. Speck* (1968), 41 Ill. 2d 177, 193, 242 N.E.2d 208.

Defendant argues that the theory of *People v. McMath* only applies to a situation where there is continuity of observation and hot pursuit of the observed offender. Analysis of the decision of *People v. Elam* dispels this theory. In that case the court applied the principle of *People v. Young* to a factual situation in which there was no continuous observation of defendant from the time of the offense until his apprehension. Instead, defendant was apprehended after being seen on a street corner by a complaining witness who, shortly after being robbed, had been cruising

the area with the police in an attempt to locate the offender. (*People v. Robinson* (1972), 3 Ill. App. 3d 843, 849, 279 N.E.2d 526.) Thus, in this case Mrs. Parker's identification of defendant in the alley shortly after the robbery did not constitute a denial of defendant's due process.

■■ ■ Assuming *arguendo*, however, that the pretrial identification procedures employed at the scene of the incident were suggestive, Mrs. Parker's testimony would still be admissible. Existence of an independent origin will validate an in-court identification even though a previous identification may have been impermissibly suggestive. (*People v. Connolly* (1973), 55 Ill. 2d 421, 303 N.E.2d 409; *People v. Patrick* (1972), 53 Ill. 2d 201, 290 N.E.2d 227.) Mrs. Parker's testimony that she first viewed defendant while his face was one foot away from her, the fact that he was under city street lights and she observed him for a period of 15 minutes as he threatened her with a linoleum knife are clear and convincing evidence that her identification of defendant had an origin sufficiently independent of the identification at the scene of the incident.

Defendant's second contention is that he was not proven guilty beyond a reasonable doubt. He argues that his identification by Mrs. Parker and Officers Farrell and Bruen was vague, doubtful and uncertain and raises a reasonable doubt of his guilt.

■■ It has been well established in Illinois that a conviction cannot stand if the identification testimony is vague, doubtful and uncertain (*People v. Cullotta* (1965), 32 Ill. 2d 502, 207 N.E.2d 444), especially if the identification testimony reveals a failure to assert or mention some physical feature of defendant. (See *People v. Gardner* (1966), 35 Ill. 2d 564, 221 N.E.2d 232; *People v. Kincy* (1966), 72 Ill. App. 2d 419, 219 N.E.2d 662.) However, it is also undisputed in Illinois that a positive identification by a single witness who had ample opportunity to observe is sufficient to support a conviction (*People v. Williams* (1975), 60 Ill. 2d 1, 322 N.E.2d 819), even though it is contradicted by the accused. *People v. Stringer* (1972), 52 Ill. 2d 564, 289 N.E.2d 631; *People v. Clark* (1972), 52 Ill. 2d 374, 288 N.E.2d 363.

Defendant lays great emphasis on four facets of the evidence presented at trial that he contends minimized the ability of Mrs. Parker to view her assailant at the time of the incident: (1) the fact that she was immediately cut on her left cheek and repeatedly struck in the face; (2) her admission that she was not wearing her glasses at the time of the incident; (3) that because she had been cut and repeatedly struck in the face she was under the greatest emotional stress and physical pain and was not in a condition to make use of the lighting conditions to aid her in observing her assailant; and (4) the fact that she failed to give a description of her assailant prior to her identification at the scene or thereafter until her appearance in court.

In attacking Mrs. Parker's identification, defendant fails to consider her testimony that she observed defendant as he followed her from a distance of one half block. He wore no mask or disguise and faced her under a street lamp at a distance of only one foot. He seized her watch and slashed her face "to show he meant business." Defendant then forced her to a nearby alley and ordered her to remove her clothes. She was able to keep his face in view as he mounted her. The entire incident took 15 minutes. Less than five minutes later, Mrs. Parker positively identified defendant at the scene of the offense. Within hours, she again identified him from a lineup as her assailant. Her description of defendant and his clothing at trial was positive and unshaken by extensive cross-examination.

From her testimony the trial judge could have reasonably concluded: (1) that although her eye was swollen she was able to sufficiently identify defendant; (2) that there was no testimony that would indicate that she was dependent on her glasses to see clearly; (3) that although frightened, she viewed defendant at extremely close range for 15 minutes under adequate lighting conditions; and (4) that the fact that she failed to give a description of her assailant to the police officers at the scene is irrelevant to any question concerning the accuracy of her identification since defendant was initially pursued and, within five minutes after the incident, captured by police officers and positively identified by Mrs. Parker.

■■ Defendant also emphasizes certain discrepancies in the testimony of Officers Farrell and Bruen, with reference to the clothing descriptions given the assailant in the alley, which indicate that the testimony was untrustworthy. Farrell observed the assailant from a distance of 80-90 feet for approximately 30-60 seconds. He testified that the assailant was wearing brown and white checkered pants. However, Bruen testified that he transmitted a radio dispatch which described the assailant as wearing dark and white checkered pants. Furthermore, Farrell allegedly testified during the grand jury hearing that the assailant was wearing a blue leather coat, while at trial he stated that the man was wearing a blue Levi jacket. Both officers testified that defendant's clothing resembled that of the fleeing assailant and Bruen stated that defendant was the assailant. To the extent such testimony is conflicting, it is the province of the trier of fact to resolve the conflict and decide what witness or witnesses shall be believed. (*People v. Nance* (1975), 26 Ill. App. 3d 182, 324 N.E.2d 652; *People v. Oestringer* (1974), 24 Ill. App. 3d 185, 321 N.E.2d 146.) Conflict in testimony does not in itself establish a reasonable doubt of defendant's guilt. *People v. Nance; People v. Clanton* (1973), 16 Ill. App. 3d 593, 306 N.E.2d 486.

Concerning Officers Farrell and Bruen's description, defendant

strongly argues that the fact that neither officer noted that a pink umbrella was in the possession of the assailant running in the alley but was in the possession of defendant at the moment of his arrest raises a reasonable doubt of his guilt, allegedly on the ground that the assailant did not carry the umbrella during the course of the robbery and battery. However, the trial court could have reasonably given this evidence the following interpretation: that defendant simply recovered his mother's umbrella, bearing the name "Emma," from its previously placed position after he ran into the dark, northern end of the alley and attempted to execute his escape.

Lastly, defendant points out that although he was stopped two and a half blocks away from the scene of the incident less than two or three minutes after it occurred, Officer Farrell stated that defendant was not breathing hard, was walking at a normal pace down the sidewalk, and did not possess the proceeds of the robbery, Mrs. Parker's wristwatch. Although Mrs. Parker bled heavily from her face wound, neither Farrell nor Bruen recalled any blood on defendant's clothing. These facts, however, do not render doubtful the identification of defendant as the assailant. From the testimony in this case, the trial court could have reasonably concluded that defendant's physical exertion in running just 1½ blocks over a period of several minutes would hardly be sufficient to cause him to breathe heavily, that during his attempted escape he disposed of Mrs. Parker's easily identifiable wristwatch, and that both Bruen and Farrell were credible when they stated that they did not examine or look for blood on defendant's clothing.

■■ Additionally, defendant contends that Mrs. Parker failed to sufficiently identify the knife as the one used by her attacker. We find this contention to be without merit. The court obviously accepted Mrs. Parker's testimony at trial that the linoleum knife was the one used by defendant to attack her. We believe this testimony by Mrs. Parker constitutes a sufficient identification of the knife and the weapon was properly admitted into evidence. See *People v. Conway* (1967), 85 Ill. App. 2d 165, 228 N.E.2d 548, *cert. denied*, 393 U.S. 1006, 21 L. Ed. 2d 471, 89 S. Ct. 498; *People v. Pittman* (1963), 28 Ill. 2d 100, 190 N.E.2d 802.

■■■ In a bench trial it is the function of the trial judge to determine the credibility of the witnesses and the weight to be afforded their testimony and to resolve any conflicts in testimony, and a reviewing court should not reverse merely because the evidence is conflicting. *People v. Akis* (1976), 63 Ill. 2d 296, 298-99, 347 N.E.2d 733; *People v. Reese* (1973), 54 Ill. 2d 51, 57-58, 294 N.E.2d 288.

Defendant places heavy reliance on *People v. Gardner* (1966), 35 Ill. 2d 564, 221 N.E.2d 232; *People v. Kincy* (1966), 72 Ill. App. 2d 419, 219 N.E.2d 662; and *People v. Cullotta* (1965), 32 Ill. 2d 502, 207 N.E.2d 444,

in asserting that his identification is so doubtful or uncertain as to justify a reasonable doubt of his guilt. This reliance is misplaced since the facts in this case differ significantly from those in *Gardner, Kincy* and *Cullotta*. In *Gardner*, a single witness' identification testimony was inconsistent and defendant presented an unimpeached and corroborated alibi defense; in *Kincy*, the complaining witness' identification testimony was vague and uncertain, because she did not testify she saw defendant's face and in her description to the police, she failed to mention that the defendant had a moustache and defendant presented uncontradicted evidence of alibi; in *Cullotta*, the witnesses had but a glimpse of the accused's profile while driving past him. In the instant case, Mrs. Parker's testimony was positive, consistent, and credible. After considering all of the evidence, including the corroborating evidence, we are of the opinion that the trial court had before it sufficient evidence to find defendant guilty beyond a reasonable doubt.

■■ Defendant's final contention is that his conviction for aggravated battery must be reversed because both the aggravated battery and the armed robbery arose from the same act or conduct and the aggravated battery is the lesser offense. No sentence was entered on the aggravated battery charge. Where "the same conduct of a defendant may establish the commission of more than one offense, the defendant may be prosecuted for each such offense." (Ill. Rev. Stat. 1973, ch. 38, par. 3—3(a).) A parallel proscription has developed in case law that an accused may not be convicted for more than one offense arising out of the same act or conduct. (See *People v. Lilly* (1974), 56 Ill. 2d 493, 309 N.E.2d 1.) In *Lilly*, defendant was convicted of rape and indecent liberties with a minor arising from the same act. The court held that since both charges arose from a single act of intercourse, the lesser offense merged into the greater, and the conviction for indecent liberties was invalid. The prohibition enunciated in *Lilly*, however, has been modified in the subsequent decision of *People v. Williams* (1975), 60 Ill. 2d 1, 322 N.E.2d 819. In *Williams*, a man was shot and killed after an encounter with two intruders who forcibly entered his home for the purpose of robbing the residents. The intruders were charged with and convicted of burglary, armed robbery, and murder. The court reversed the burglary conviction holding that although the two crimes of burglary and armed robbery involve different elements of proof, the two crimes arose from the same conduct, since both reflected the original objective of robbing the occupants of the house. However, the reviewing court affirmed the convictions for murder and armed robbery based on the reasoning that the purpose of the entry of the offenders was robbery not murder and that the original objective changed to murder in order to avoid injury or

apprehension. (See *People v. Green* (1975), 62 Ill. 2d 146, 340 N.E.2d 9, *cert. denied*, 426 U.S. 925; *People v. Johnson* (1970), 44 Ill. 2d 463, 256 N.E.2d 343, *cert. denied*, 400 U.S. 958.) In a case more factually analagous to the case before us, *People v. Thomas* (1970), 127 Ill. App. 2d 444, 262 N.E.2d 495, the defendant was convicted of rape, aggravated battery, attempt murder, and robbery. The evidence showed that defendant wielded a knife that he used to inflict multiple wounds upon the victim, beat her head against a chest of drawers, raped her, robbed her, and fled. The court concluded that the conduct by which defendant cut the victim was separable and independently motivated from the conduct by which he raped and robbed her later. On the basis of *Williams, Green, Johnson,* and *Thomas*, we conclude that the slashing of Mrs. Parker's face with the linoleum knife by defendant prior to the robbery was a use of force far more than was necessary to effectuate submission to the robbery and was motivated by a desire to physically injure her, and thus the armed robbery and aggravated battery of Mrs. Parker did not arise from the same act; the aggravated battery was independently motivated, and the aggravated battery conviction should therefore be affirmed.

In support of his contention that where force is used to overcome resistance and effectuate the intended armed robbery offense, the offenses arise from the same conduct and only one conviction for the greater offense of armed robbery is permissible, defendant relies on *People v. Jordan* (1975), 33 Ill. App. 3d 80, 337 N.E.2d 468, and *People v. Ashton* (1975), 32 Ill. App. 3d 353, 336 N.E.2d 582. In *Jordan*, the victim was in a parking lot when he was accosted by four males, one of whom was defendant; defendant pushed him in the face and body and he was knocked to the ground; while he was on the ground, defendant and others began to kick him; defendant went through his pockets and removed currency and keys from his person without his consent. Defendant was charged and convicted of both aggravated battery and robbery. The court vacated the aggravated battery conviction reasoning that the two crimes were part of the same conduct of defendant and the conviction for the lesser offense, aggravated battery, hence was invalid. In *Ashton*, the defendant grabbed the victim, who was standing on an "L" platform, from behind and held a knife to her throat, then pushed her behind an advertising sign, grabbed her radio, and asked if she had any money. On these facts the court concluded that "[t]he use of force or the threat of the imminent use of force is an essential element of the crime of robbery. Holding the knife to the victim's throat was merely a prelude to the taking of her property—the force and intimidation used to effect the robbery * * *" (32 Ill. App. 3d 353-54), and for this reason the court reversed the aggravated battery conviction. The facts that were before the *Jordan* and

536

*Ashton* courts are not applicable to the facts in the present case and we find no error in the conviction of defendant for both aggravated battery and armed robbery.

For the foregoing reasons, the judgment of the Circuit Court of Cook County is affirmed.

Affirmed.

SULLIVAN, P. J., and LORENZ, J., concur.