(No. 39701.—

THE CITY OF CHICAGO, Appellee, *vs.* JOHN HILL *et al.,* Appellants.

*Opinion filed June 21, 1968.*

Ralph E. Brown and Richard J. Walsh, both of Chicago, for appellants.

Raymond F. Simon, Corporation Counsel, of Chicago, (Marvin E. Aspen and Edmund Hatfield, Assistants Corporation Counsel, of counsel,) for appellee.

Mr. Justice Schaefer delivered the opinion of the court:

Each of the defendants, John A. McDermott, Reverend John Hill, Reverend Thomas Heaney and Reverend Richard Heidkamp, was charged with violating ordinances of the city of Chicago prohibiting the obstruction of traffic (Municipal Code, sec. 27—291) and disorderly conduct (Municipal Code, sec. 193—1). The cases were consolidated for trial. Each defendant was found guilty and each was find $100 for obstructing traffic and $25 for disorderly conduct.

On this direct appeal, the defendants attack the con-

stitutionality of both ordinances on the ground that they violate section 13 of article IV of the constitution of Illinois. They also assert that the disorderly conduct ordinance "is unconstitutionally vague because it can be used to deny the protected freedoms of speech and assembly," and they contend that the ordinances were discriminatorily enforced and that the conduct of the police amounted to entrapment.

On the afternoon of June 11, 1965, the defendants were among approximately 300 to 350 civil rights demonstrators who participated in a march that began just south of Soldiers' Field in Chicago. The group marched north from Soldiers' Field, four to eight abreast, in the two most westerly lanes of the Outer Drive leaving the other lanes open for motor vehicles. They were escorted by a number of police officers both in front and to the side of the line of march. At the intersection of the Outer Drive and Balbo Drive, they turned west and continued in the two most northerly lanes of Balbo Drive, leaving four lanes open for motor vehicles. On the west side of the intersection of Columbus Drive and Balbo Drive, there were police officers formed in a line designed to funnel the marchers from two traffic lanes into one. Balbo Drive narrows from six to four lanes at the bridge over the tracks of the Illinois Central Railroad, between Columbus Drive and Michigan Avenue.

The marchers objected to this change, and stopped while a discussion took place with the police officers in charge. The police told the leader of the demonstration that to facilitate the flow of vehicular traffic the marchers had to confine themselves to one lane of traffic beyond Columbus Drive. The demonstrators, however, insisted that they had received prior authorization from the police to occupy two traffic lanes throughout their march. They refused to proceed, and sat down in the street. Officer Robert Murray, who was assigned to crowd control, testified that during this confrontation he observed "approximately 350 people

sitting down in the intersection and traffic was stopped * * * and they were holding hands and arms, singing songs * * * and chanting slogans * * * at the top of their voices." Five other police officers, including Deputy Chief of Police John P. Kelly, who was "in charge of the police detail assigned to the * * * marchers," corroborated this statement. The officers also testified that they saw the four defendants sitting in the intersection of Columbus and Balbo.

Chief Kelly testified that prior to the sit-down about twenty cars would pull up before the traffic light turned to green so that they could cross Balbo Drive on Columbus Drive. After the demonstrators sat down, however, a line of cars "approximately one block north and one block south of Balbo Drive [was] tied up." Chief Kelly assigned officers to direct the cars that "were backed up [to] make a U-turn and go in the opposite direction, the direction they had come from." He testified that his aide, Commander Riordan "went up and down, to the people who were sitting in the street, and ordered them to get up and leave or they would be arrest[ed] * * *." Chief Kelly further testified that he personally ordered the three defendants who are priests "to get out of the street, and * * * advised them if they did not, they would be arrested, and they refused * * *." Over 150 arrests were made.

Section 13 of article IV of the constitution provides: "No act hereafter passed shall embrace more than one subject, and that shall be expressed in the title." The defendants' contention that the ordinances are invalid because they violate this provision is without merit. "Section 13 of article IV of the constitution, to which counsel refer, applies only to acts of the legislature and not to city ordinances. *Harris* v. *People,* 218 Ill. 439." *City of Metropolis* v. *Gibbons,* 334 Ill. 431, 434; see also, *Chicago Cosmetic Co.* v. *City of Chicago,* 374 Ill. 384, 393.

Defendants contend that their convictions "must be re-

versed because the police actions in this case constitute entrapment in that the convictions were obtained for actions which the police had indicated were lawful." They assert that the police had agreed to allow the marchers to use two traffic lanes throughout the march, and argue that the arrests for blocking the intersection after the police insisted that the march be confined to one traffic lane west of Columbus Drive were "for performing activities which the police had permitted earlier and upon which defendants relied to their ultimate hurt."

Although the record suggests that at least two of the defendants may have believed that the police had authorized the use of two lanes throughout the march, and one defendant testified that at the beginning of the march the demonstrators were instructed by their leader to remain in two lanes, there is no evidence that any specific agreement had been reached. In fact, the defendants' evidence which bears most directly on the question tends to negate that conclusion. Defendant McDermott testified that at the pre-march conference at which the agreement was allegedly made, "Mr. Albert Raby, the leader of the march, informed the police * * * that we did not intend to occupy the whole street * * *." Defendant Heaney stated that "after conferring with the police officers * * * [Mr. Raby] agreed we would conduct an orderly demonstration and not occupy the whole street as had been done on previous occasions." These statements tend to support Chief Kelly's testimony that the marchers had been informed that at least one lane in each direction was to remain open to vehicular traffic.

Defendants rely upon *Raley* v. *Ohio* (1959), 360 U.S. 423, 3 L. Ed. 2d 1344, 79 S. Ct. 1257, for the proposition that it is "an indefensible sort of entrapment by the State— [to convict] a citizen for exercising a privilege which the State had clearly told him was available to him." (360 U.S. at 426, 3 L. Ed. 2d at 1348.) In *Raley,* the defendants

refused to answer questions put to them at sessions of the Ohio Un-American Activities Commission after the Commission had informed them that they could invoke their privilege against self-incrimination. They were subsequently convicted for their refusals under an Ohio immunity statute. Thus, the defendants in *Raley* were convicted for the very act they had been told they could commit. The defendants here were convicted for sitting down in an intersection and blocking traffic. There is no evidence that the police had even indirectly suggested that such conduct was permissible, and the defendant's contention that they were entrapped must be rejected.

The contention that the ordinance prohibiting the willful obstruction of traffic was discriminatorily enforced against the defendants is also without merit. Those marchers who sat down in the intersection and refused to move when asked to do so by police officers were arrested; the others were not. It is not suggested that sitting in street intersections has been generally condoned or overlooked.

It appears from the record that the charge of disorderly conduct is also based upon the action of the defendants in sitting down in the street intersection. In its brief the city refers to the "public disturbance" the defendants created "by sitting and lying in the street at a busy intersection, singing songs loudly and causing a motor traffic tie-up to exhibit their defiance of the police". The record does not suggest that the singing of songs, isolated from the other conduct, was regarded as offensive. To impose a separate fine for the violation of each ordinance, therefore, is to punish the same conduct twice. In *People* v. *Duszkewycz*, 27 Ill.2d 257, we held that earlier decisions had made it "clear that two punishments can not be imposed for a single act, even though different ingredients are involved in the two crimes." (27 Ill.2d at 261.) The prohibition against double punishment has been codified in section 1—7(m) of the Criminal Code, which forbids consecutive or

concurrent sentences "when a person shall have been convicted of 2 or more offenses * * * result[ing] from the same conduct." (Ill. Rev. Stat. 1967, chap. 38, sec. 1—7(m).) This provision constitutes a policy declaration by the General Assembly against double punishment, whether cumulative or not. (See Committee Comments, S.H.A., 1964, chap. 38, § 1—7(m) p. 32; Craven, Sentencing, 1965 U. Ill. L.F. 523, 537-38.) We see no reason why this policy should not apply to violations of municipal ordinances.

Since the convictions under both ordinances were obtained for identical conduct—blocking the intersection of Balbo and Columbus drives—one of them must be reversed. In both *Duszkewycz* and *People* v. *Schlenger*, 13 Ill.2d 63, we set aside the conviction for the offense which the General Assembly had regarded as the least serious. In this case, however, the Municipal Code does not reveal that the city council regarded either as more serious.

The inclusiveness of the city of Chicago's disorderly conduct ordinance suggests that at least one of its purposes is to insure the prohibition of all relatively minor acts that disrupt public order. These acts may not be readily prohibited in specific terms because of the difficulty in anticipating and particularizing them. The defendants' conduct, however, does not fall within this category. They were convicted for the willful obstruction of traffic, conduct which is specifically prohibited by section 27—291 of the Municipal code: "Any person who shall willfully and unnecessarily hinder, obstruct or delay * * * any other person in lawfully driving or traveling along or upon any street * * * shall be guilty of a misdemeanor." In such a situation the intent of the legislative body is best served, in our opinion, by setting aside the conviction for the more general offense. See generally Remington & Joseph, Charging, Convicting and Sentencing the Multiple Offender, 1961 Wis. L. Rev. 528; Note, Consecutive Sentences in Single

Prosecutions: Judicial Multiplication of Statutory Penalties (1958), 67 Yale L.J. 916.

As to each defendant, therefore, the judgment of the circuit court of Cook County finding him guilty of disorderly conduct in violation of section 193—1 of the Municipal Code of Chicago is reversed, and the judgment finding him guilty of obstructing traffic in violation of section 27—291 of that Code is affirmed.

*Affirmed in part and reversed in part.*