THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.* HENRY DEE *et al.*, Defendants-Appellants.

(No. 58810; ▆▆▆▆▆▆▆▆▆

First District (1st Division)—February 18, 1975.

692

Paul Bradley and Martin Carlson, both of State Appellate Defender's Office, of Chicago, for appellant.

Bernard Carey, State's Attorney, of Chicago (Patrick T. Driscoll, Jr., and Mary Ellen Dienes, Assistant State's Attorneys, of counsel), for the People.

Mr. PRESIDING JUSTICE BURKE delivered the opinion of the court:

Henry Dee and James Sayles were found guilty of the murder and armed robbery of Arthur Snyder and the murder and armed robbery of Edith Snyder after being tried jointly before a jury in the circuit court of Cook County. Both defendants were sentenced to concurrent terms of 100 to 200 years for the two murders and 20 to 40 years for the two armed robbery counts. Both defendants filed a joint appeal of their convictions and raise the following arguments: (1) The trial court erred in admitting into evidence a certain photograph of the body of one of the murder victims; (2) it was error for the court to have denied the defendants' motion to prohibit the introduction of Henry Dee's prior convictions; (3) it was error for the court to permit a State witness to testify from medical records that the witness had prepared; (4) the prosecution's argument that Edith Snyder had been sexually assaulted by the defendants was improper; and (5) the evidence was insufficient to establish the defendants' guilt beyond a reasonable doubt.

The evidence presented at the trial can be divided into four broad categories: the condition in which the victims' bodies and home were found; the circumstances surrounding the defendants' arrest; the identification of certain articles seized from the defendants at the time they were arrested; and expert testimony linking the defendants to the scene of the crime. The crimes were discovered when two Chicago firemen, Robert Hartwig and Joseph Grajek, entered a residence at 5412½ North Kenmore Avenue in Chicago at approximately 2:30 A.M. on August 17, 1971, in response to a fire alarm. The firemen testified that inside they discovered the bodies of Arthur and Edith Snyder. Edith's body was found lying on a bed, her hands bound behind her back, her mouth gagged, and her eyes blindfolded. Her legs were spread apart with her nightgown drawn up above her hips completely exposing the lower part

of her body. Arthur Snyder's body was found lying on the kitchen floor also with his hands bound behind his back. A claw hammer was embedded in his skull, and a considerable amount of blood was splattered about the immediate vicinity of Arthur Snyder's body.

A fire which had been emanating from the bedroom in which Edith Snyder's body was found was extinguished. The two firemen detected the strong odor of gas in the apartment and found that the gas jets on the kitchen stove had been turned on. Two police officers, William Lahey and Andrew Wise, arrived about 20 minutes later in response to a call made by the firemen. They testified that they found the bodies of Arthur and Edith Snyder as described by the two firemen. Detective Frank Heatley, a homicide investigator, testified he arrived at about 2:50 A.M. and observed the bodies of both of the victims. A laboratory technician, James Frankenbach, testified he arrived an hour later and examined the body of Arthur Snyder. These six witnesses all concurred on the condition in which the Snyders' bodies were found.

Dr. Jerry Kearns, a coroner's pathologist, testified that he had examined the bodies of both Arthur and Edith Snyder and determined that the cause of death in both cases was extensive brain damage caused by fragmented fractures of the skull. He testified that a claw hammer was the type of instrument which could cause such injuries.

At about 3 A.M. that morning, a short time after the discovery of the crime, four Chicago police officers, Lynn Brezinski, Hugh Cahill, Larry Race and William Durkin, testified that they were in Washington Park in Chicago. They were then unaware of the events at the Snyder house. At that time they observed a Yellow Cab proceeding on Russell Drive without its lights on. The cab halted and two individuals later identified as the defendants, Henry Dee and James Sayles, exited the cab and began walking in the general direction of the police officers. One of the officers shined a light on them which revealed a hand gun inserted in Dee's waistband. Officer Cahill shouted, "Halt, police." The defendants both attempted to flee but were tackled by the police officers. While Dee was fleeing he threw down a blue shirt he was carrying which was later recovered by the police.

Both defendants were searched. The search of James Sayles recovered a number of pieces of identification issued to an Arthur Snyder including a chauffeur's license, credit cards and a transportation bond card. Sayles was also in possession of a Polaroid land camera. Henry Dee had in his possession a .32-caliber revolver in his waistband and some silver certificates and coins later found to be collector's items. Radio communications with their police headquarters revealed that the cab the defendants had been seen driving was checked out to Arthur Snyder.

The defendants were then transported to a police station. All four officers testified that they observed no injuries, cuts or bruises on the defendants at the time they were arrested. Officer Cahill testified specifically that the defendants were not injured in any way at the time of their arrest nor when they were transported to the police station. Investigator Heatley, who had arrived at the police station where the defendants were being held, testified that he observed what appeared to be blood splattered on the clothes of both defendants. He ordered photographs taken of both defendants with their clothes on. The photographs, which were admitted into evidence at the trial, reveal a dark substance splattered on the clothes of both defendants and also show the absence of any observable facial injuries to the defendants.

One of the defendants, Henry Dee, testified for the defense. Dee testified that he had been at defendant Sayles' home the night of August 16, 1971, and he stayed there with Sayles until about 2:35 A.M. on the morning of August 17, 1971. Three persons, in addition to Dee and Sayles, were also present: Dee's girl friend, Maxine Ellison; Sayles' wife, Geraldine; and another woman named Jessie. Dee testified that the three women left Sayles' home at various times that night, the last leaving at about 1:30 A.M. Maxine Ellison, the last to leave, testified that she left Sayles' home about 1 A.M. that morning.

Dee then testified that he and Sayles left the house on foot about 2:35 A.M. on the morning of August 17, 1971, and while crossing 62nd Street they had to hurry to avoid a speeding car. A few moments later they were called over to a police car and were questioned as to their identity and activities in the area. Dee testified that the police ordered them into the police car and transported them to Washington Park where a Yellow Cab was parked. In response to police questioning, both defendants denied any knowledge of the cab. Dee testified that the officers then beat and kicked both him and Sayles and struck them with guns and sticks, leaving the defendants with cuts, bruises and scrapes. Dee testified he was bleeding from both sides of the face. The officers, according to Dee, then went to the cab and removed a number of articles including a blue shirt and threw them in a pile on the ground. They then searched the two defendants and threw the items they found into the same pile. The defendants were then taken to the police station where they were questioned and photographed. Dee testified that the next day while he was being examined by a doctor at the County Jail, he told the doctor of the beating.

In rebuttal, the State called Dr. Stanley Gierasinski whose job it was to examine persons brought to the receiving room at the County Jail. Dr. Gierasinski was initially unable to recall the results of his examination

of Dee and Sayles. After examining medical records he made the day of the examination, he testified that neither Dee nor Sayles told of any such beating. The doctor also testified that he had not observed any recent injuries, bruises or cuts on either of the defendants that day.

In the State's case, evidence was presented identifying a number of items the arresting officers had recovered from the defendants at the time of their arrest. The Snyders' daughter, Bonnie Klecan, identified a silver certificate, some rare coins, some credit cards, and the camera as belonging to her parents. A photograph and several negatives from the camera were also identified. Bonnie's husband, William Klecan, also identified the camera.

The State also presented expert testimony concerning certain substances found on the defendants' clothing. A laboratory technician from the Chicago police crime laboratory, Timothy Zamb, testified that he had taken samples of splattered reddish-brown stains found on Sayles' shirt, trousers and gloves and on the blue shirt the police testified Dee had thrown to the ground before his arrest. Tests determined that the substance was type B blood. James Sayles, Henry Dee and Edith Snyder all had type O blood, Zamb testified. However, Arthur Snyder had type B blood.

Zamb also testified that particles of carbonaceous material, a carbon compound which includes matter such as ash and soot, were found upon the clothes of both defendants. Zamb found that the carbonaceous material found on the defendants was morphologically similar to carbonaceous particles found upon the clothing of Edith and Arthur Snyder. An expert for the defense, Ronald Draftz, testified that such particles were generally present in the atmosphere, and Zamb's tests were inadequate to show a similarity between them.

Dr. Vel Vasan, an expert for the State, testified that a particle of paint recovered from James Sayles' shoe was similar in respect to color, texture, pigmentation, solubility and chemical composition to particles of paint found in the Snyders' household. The defendants' expert witness, Ronald Draftz, testified that tests used by the State's expert were insufficient to establish a strong similarity between the paint chips in question.

The defendants' first contention was that it was error to admit into evidence People's Exhibit No. 12, which was a photograph of Arthur Snyder's body lying face down with a claw hammer embedded in the back of the skull. Defendants argue that the inflammatory nature of the photograph far outweighs any probative value it may have. Prior to the admission of People's Exhibit No. 12, a number of witnesses had testified to the fact that they had discovered Arthur Snyder's body lying in such

a position with a claw hammer embedded in the skull. Three other photographs of Arthur Snyder's body were also admitted into evidence before Exhibit No. 12. In two of these photographs, the handle of the hammer can be clearly seen extending from the direction of the deceased's skull. The only differences between the latter two photographs and People's Exhibit No. 12 is that No. 12 shows the point of entry of the hammerhead into the skull and also more adequately shows the splattering effect of the victim's blood. While No. 12 is the most gruesome photograph, the other two photographs show most of what No. 12 shows and are certainly gruesome themselves. The defendants do not object to these other photographs on appeal. The court admitted People's Exhibit No. 12 into evidence after the prosecutor stated that it was offered to show the condition of the murder victim's body.

■■ The fact that a photograph is gruesome does not mean it is not admissible. In a murder case a gruesome photograph of the deceased's body is admissible if it is probative in establishing any fact in issue, and the fact that testimony has already been heard regarding the body's condition does not bar the prosecution from introducing such a photograph. (*People v. Henenberg*, 55 Ill.2d 5, 302 N.E.2d 27.) The probativeness of the photograph should be weighed against the degree to which the photograph is likely to inflame the jury.

■■ People's Exhibit No. 12 is undoubtedly a gruesome photograph. However, we are dealing with a gruesome crime. The jury had already heard the grisly details of the crime from a number of witnesses and other gruesome photographs depicting Arthur Snyder's body, and the handle of the hammer had already been admitted in evidence. It was unlikely at this point that People's Exhibit No. 12 would create a great deal more revulsion in the jurors toward the crimes perpetrated than was already present. When this is weighed against the photograph's probative value, its admissibility becomes more apparent. It of course clearly demonstrates the most likely cause of death. It is true that testimony concerning the cause of death had already been presented. The photograph's greatest probative value, however, was its depiction of the amount and manner in which Arthur Snyder's blood had been splattered about the immediate area. Arthur Snyder had type B blood while both of the defendants had type O blood. There was no bit of evidence in the trial which could better demonstrate the likelihood that Arthur Snyder's blood would have been splattered on those individuals who were responsible for his death than People's Exhibit No. 12. We are of the opinion that it was not error for the court to admit this exhibit.

The defendants' second contention was that the trial court abused its discretion in denying the defendants' motion to prohibit the introduction

of Henry Dee's prior convictions. During a hearing on the defendants' motion the prosecution stated that Dee had been convicted of two counts of armed robbery growing out of 1967 indictments. Dee was convicted of those charges in 1968. Dee would have been age 19 or 20 when convicted. The State argued to the court that robbery was a type of theft, and the fact that a man is a thief is probative of that man's credibility as a witness. The defense counsel made no argument to the court. The court then denied the defendants' motion. Henry Dee then took the stand and testified that he had been convicted of a crime in Cook County in the past. On cross-examination Dee testified that the crime he had been convicted of was armed robbery.

■■ The defendants' argument is primarily based on the contention that because Dee's prior convictions were for the same crime, namely armed robbery, that he was now being tried for, the prejudice to the defendant would greatly outweigh whatever probative value the prior convictions might have. The rules governing the admission of prior convictions of a defendant are set forth in *People v. Montgomery*, 47 Ill. 2d 510, 268 N.E.2d 695. *Montgomery* held that the trial court may in its discretion admit evidence of such prior convictions unless the court determines that "the probative value of the evidence of the crime is substantially outweighed by the danger of unfair prejudice." (47 Ill.2d 510, 516, 268 N.E.2d 695, 698.) In addition, *Montgomery* cited a number of factors to consider when a court weighs the probative and prejudicial values of the prior convictions. These factors are: (1) the nature of the prior crimes; (2) the length of the defendant's criminal record; (3) the defendant's age; (4) the likelihood that the defendant would not testify if his motion to exclude his prior convictions was denied; (5) the nearness or remoteness of the prior convictions; (6) the defendant's subsequent career; and (7) whether the prior crime was similar to the one charged.

The fact that the prior conviction is for a crime which is the same as the crime now charged does not mean it must not be introduced. Prior convictions have been found admissible where the prior crime and present charge were both robbery (*People v. Clark*, 3 Ill.App.3d 196, 278 N.E.2d 511) or the prior crime and present charge were both burglary. (*People v. Dailey*, 15 Ill.App.3d 214, 304 N.E.2d 156.) A prior conviction for robbery has been found probative of a defendant's credibility as a witness. (*People v. Havener*, 13 Ill.App.3d 312, 300 N.E.2d 43.) In the case of *Gordon v. United States* (D. C. Cir. 1967), 383 F.2d 936, a case cited by *Montgomery*, the court discussed what types of crimes are probative of a witness' credibility for veracity and what crimes are not probative. The *Gordon* court stated:

"In common human experience acts of deceit, fraud, cheating, or stealing, for example, are universally regarded as conduct which reflects adversely on a man's honesty and integrity. Acts of violence on the other hand, which may result from a short temper, a combative nature, extreme provocation, or other causes, generally have little or no direct bearing on honesty and veracity. A 'rule of thumb' thus should be that convictions which rest on dishonest conduct relate to credibility whereas those of violent or assaultive crimes generally do not; traffic violations, however serious, are in the same category." (383 F.2d 936, 940.) (Footnotes omitted.) While the crime of robbery involves an element of violence, this does not remove it from the category of crimes which involve dishonesty. Robbery is a form of stealing which *Gordon* included in crimes which reflect on the honesty and integrity of the perpetrator. Robbery is not a crime of passion or violence done in response to some form of provocation. It is generally a preplanned crime designed to steal property from a person in rightful possession. We are of the opinion that a prior conviction for the crime of robbery, whether armed or otherwise, is probative of the perpetrator's honesty and veracity as a witness.

In applying the factors set forth in *Montgomery* to Henry Dee's prior robbery convictions, we find that a number of these factors point to the probative value of Dee's prior convictions. The nature of the crime, robbery, is probative of the defendant's veracity. The defense never intimated that the defendant would not testify if the court ruled adversely, and in fact Henry Dee did testify. Both convictions were only 4 years prior to the instant trial and are not remote in time. The only real factor favoring the defendant's position is the fact that the prior convictions were for a similar crime for which he was charged in the instant trial. While this may cause some prejudice to the defendant, we do not find that the possible prejudice substantially outweighed the probative value of the prior convictions as the *Montgomery* rule requires.

■■ We find that the trial court did not err when it denied the defendants' motion to prohibit introduction of Dee's prior convictions. In addition, we do not agree with the defendants' contention that the trial court did not exercise its discretion in considering both the probative and prejudicial effects of allowing the prior convictions to be introduced. The facts regarding the prior convictions were presented to the trial judge before he made his ruling, in addition to the fact that the prosecution argued to the court that robbery was a form of theft which reflected upon the defendant's honesty.

The defendants' third contention is that the court erred in permitting a doctor from the County Jail to testify from his medical records because

the records were hearsay and the prosecution failed to have the records or his testimony properly introduced as a past recollection recorded or a present recollection revived. The doctor had testified to rebut Henry Dee's testimony that he and Sayles had been beaten and that Dee had told his examining doctor at the County Jail about their beating the day after it happened. In rebuttal Dr. Stanley Gierasinski, who was assigned to examine persons brought to the receiving room of the County Jail and had examined the defendants that day, stated that he was unable to recall the results of his examination of Henry Dee and James Sayles without referring to the records he had made. He was handed his records. He then responded to the prosecutor's questions after referring to these records which he had in his possession during the questioning. He testified that neither Dee nor Sayles had told him of any beating and that he had found no injuries, cuts or bruises on the defendants.

■■ We find that even if this testimony was improperly presented to the jury, the defendants have not preserved their right to appeal this point. Only general objections were made in response to the prosecution's questions. At no time did the defense state at trial that the testimony was inadmissible nor did the defense give any reason for their objections. A general objection is not sufficient to preserve a party's right to appeal the admission of evidence presented at trial. *People v. Jennings*, 298 Ill. 286, 131 N.E. 619; *People v. Killebrew*, 55 Ill.2d 337, 303 N.E.2d 377; *People v. Curry*, 56 Ill.2d 162, 306 N.E.2d 292; *People v. McCoy*, 3 Ill. App.3d 642, 279 N.E.2d 417; *People v. Garner*, 91 Ill.App.2d 7, 234 N.E. 2d 39.

■■ Even if the defendants had preserved their right to appeal the admission of Dr. Gierasinski's testimony, the admission of that testimony was harmless error. The doctor's testimony was for the sole purpose of rebutting Dee's testimony that the two defendants were beaten when they were arrested. Whether or not this beating took place is a peripheral issue to the case and does little to prove or disprove the defendant's guilt. In addition, there was a substantial amount of other evidence which also rebutted Dee's testimony concerning the alleged beating. All four arresting officers stated that the defendants did not have any visible injuries when taken into custody. The photographs taken of both defendants within 2 hours of their arrest show no signs of any cuts or bruises and make Dee's testimony on this point extremely doubtful. Furthermore, the blood tests made demonstrated that the blood splattered on the defendants' clothing was type B and therefore not the defendants' blood which was type O.

The defendants next contend that certain statements made by the

prosecution in their closing argument were improper. The statements complained of concerned the prosecution's argument that the defendants had sexually assaulted Edith Snyder while perpetrating the crimes they were charged with. The defense based its contention on two prongs: that the statements were not supported by the evidence, and that the statements only served to inflame the passions of the jury rather than serve any probative purpose in establishing the defendants' guilt.

In the closing argument, the prosecutor outlined in chronological order the development of the events relating to Arthur and Edith Snyder in the early morning hours of August 17, 1971. As part of this presentation the prosecution stated that Edith Snyder was sexually assaulted by the defendants while she lay in her bedroom bound and gagged. The prosecution noted that the presence of a large quantity of sperm in Edith's vagina was revealed by laboratory tests. The prosecution noted that the defense had presented testimony that both defendants had gone to bed with the women present at their apartment earlier that night. The prosecution then suggested that the jury should consider this testimony in connection with testimony by an expert witness for the State as to "what was found in the fly area of both defendants' underpants."

During the trial, evidence was brought out which raised the possibility that a sexual assault on Edith Snyder had been perpetrated by those who had committed the crimes the defendants were charged with. A number of witnesses had testified that Edith Snyder's body was found lying on a bed with her hands bound behind her back, her mouth gagged and her eyes blindfolded. Her legs were spread apart and her nightgown was drawn up over her hips leaving the lower half of her body totally exposed. This testimony was corroborated by a photograph (People's Exhibit No. 13) entered into evidence which showed Edith's body in just such a position. Furthermore, an expert for the prosecution, Timothy Zamb, testified that tests revealed that there was a large quantity of sperm present in Edith's vagina. Mr. Zamb had also testified that tests performed on the defendants' clothes revealed a "dried mucous type crystalline incrustation" on both defendants' undershorts in the fly area. Zamb however noted that the tests which uncovered this substance did not reveal the presence of spermatozoa.

It is improper to make statements of fact or alleged fact when arguing to the jury which are not based upon the evidence. (*People v. Beier*, 29 Ill.2d 511, 194 N.E.2d 280.) It is also improper for a prosecutor to make statements which only result in inflaming the jury against the defendant without throwing any light on the questions for decision. (*People v. Dukes*, 12 Ill.2d 334, 146 N.E.2d 14.) However, it is proper for a

prosecutor to make statements which are based on the evidence and legitimate inferences from that evidence. *People v. Williams*, 38 Ill.2d 115, 230 N.E.2d 224.

One could draw a reasonable inference from the evidence presented at trial that Edith Snyder was sexually assaulted by the same persons who murdered her and her husband Arthur. The defendants contend that the prosecution's statements regarding what was "found in the fly area" of the defendants' shorts implied that sperm was found there. The prosecution never said there was sperm there, however. The prosecution's only possible impropriety was in drawing a perhaps unwarranted connection between evidence that Edith might have been sexually assaulted and the mucous substance on the defendants' shorts.

■■ Whether or not Edith Snyder was sexually assaulted was not crucial to the outcome of the case, because the defendants were not charged with such an assault. The evidence regarding whether Edith was so assaulted only provided a possible link in the identification of those who had murdered her. We are of the opinion that the implied connection the prosecution drew between the mucous substance found on the defendants' shorts and the possibility that Edith Snyder was sexually assaulted did not substantially prejudice the defendants. We are also of the opinion that the prosecution's discussion of the evidence relating to a possible sexual assault on Edith Snyder had a valid purpose. This evidence was part of the circumstances surrounding her death and could provide another link to those who murdered her.

The defendants' final contention is that the prosecution failed to prove the defendants guilty beyond a reasonable doubt. The defendants argue that conflicts between the arresting officers' testimony at a pretrial hearing and their testimony at trial concerning the defendants' arrest and the articles the police seized create a reasonable doubt. We do not agree.

It first should be noted that the defendants are not alleging any conflicts in what was said at trial but only that there were a few discrepancies between what was testified to at a hearing held prior to trial and what was testified to at trial. The majority of the conflicts the defendants point to are merely failures by the arresting officers to mention certain details concerning the arrest and what was seized. A great number of items were taken from the defendants when they were arrested and it is understandable that the officers might not mention them when not asked specifically about the items. Only two conflicts in testimony were not of this nature. Officer Brezinski testified at the preliminary hearing that he removed no clothing from James Sayles, whereas he testified at the trial that he removed a pair of gloves from James Sayles. Brezinski had also testified at trial that he had found a driver's license in Sayles' wallet

issued to James Sayles. At the preliminary hearing, after referring to his inventory sheet, Brezinski testified that he did not recover a driver's license issued to James Sayles.

■■ We are of the opinion that these conflicts in the officers' testimony which the defendants cite are minor in nature. Testimonial conflicts in the prosecution's case which are minor in nature do not create reasonable doubt as a matter of law. It is the province of the finder of fact to resolve these conflicts when determining the credibility of the witnesses. *People v. Handley*, 51 Ill.2d 229, 282 N.E.2d 131; *People v. Moore*, 50 Ill.2d 24, 276 N.E.2d 319; *People v. Raynor*, 57 Ill.App.2d 128, 207 N.E.2d 154.

■■ The defendants, after contending that there is a reasonable doubt as to the circumstances surrounding the defendants' arrest, then go on to argue that because the expert testimony concerning the blood tests, paint chips and carbonaceous matter was not "conclusive" of the defendants' guilt, the defendants' guilt has not been proven beyond a reasonable doubt. It is unnecessary to discuss how "conclusive" the expert testimony was, because we are of the opinion that the evidence presented concerning the defendants' arrest, the articles recovered from them, and the condition in which the Snyders' bodies and home were found provided sufficient evidence for a jury to find that the defendants were guilty beyond a reasonable doubt.

For the foregoing reasons the judgments are affirmed.

Judgments affirmed.

GOLDBERG and EGAN, JJ., concur.