THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.* WILBERT HARRIS, Defendant-Appellant.

First District (1st Division)   No. 61652

Opinion filed June 14, 1976.

James J. Doherty, Public Defender, of Chicago (Harold Cowen and David Hirschboeck, Assistant Public Defenders, of counsel), for appellant.

Bernard Carey, State's Attorney, of Chicago (Laurence J. Bolon, John T. Theis, and Stuart D. Gordon, Assistant State's Attorneys, of counsel), for the People.

Mr. JUSTICE BURKE delivered the opinion of the court:

Wilbert Harris was found guilty of theft and battery by a jury and was sentenced on each charge to a term of "one year less one day," the sentences to run concurrently. The defendant appeals contending: (1) that he was not proven guilty of either charge beyond a reasonable doubt; (2) that the court erred in allowing the prosecution to impeach his testimony on collateral matters; and (3) that his battery conviction should be reversed because the battery was merely incidental to the theft and part of the same transaction.

At trial, Oscar Aguilera, the complaining witness, testified that on the evening of July 23, 1974, he was employed as a security guard at the Community Discount Store at 3161 North Clark Street in Chicago, Illinois. At approximately 7:45 p.m., Aguilera observed the defendant and another person enter the store and proceed to the ladies' department where they browsed for about ten minutes. Aguilera testified that he observed the defendant remove six pants suits, complete with hangers, from a display rack and proceed into the drug department. The defendant then removed a brown shopping bag with handles from underneath his shirt and pants and placed the pants suits into the bag. Several minutes later the defendant walked to the cashier's line and got in line behind the other customers. Aguilera then observed the defendant pass through the line holding the bag with the pants suits down low without paying for the pants suits and head for the front entrance.

Aguilera testified that he positioned himself outside on the sidewalk and when the defendant came through the door Aguilera identified himself as a security guard for the store and produced his identification card. The defendant then struck Aguilera on the chin, dropped the shopping bag, pushed Aguilera to the ground and fled. Aguilera and Ray Samlow, the acting store manager who appeared on the scene at that moment, pursued the defendant down Fletcher Street. The defendant ran into a dead-end alley, and Aguilera and Samlow cornered him and put handcuffs on him. Aguilera testified that he drew his gun for the first time while he was in the alley and he did not fire any shots during the entire incident.

Aguilera testified that he and Samlow then took the defendant back to the store and the three of them went into the security office. About five minutes later at approximately 8:40 p.m., Kennedy, another security guard, brought up a brown bag with the six pants suits in it. Aguilera inventoried the pants suits and placed his initials and the date on the tags which were attached to the pants suits. The suits had "IBM tags" which Aguilera explained had two parts, one of which would be removed by the cashier when the item is paid for. He observed that the tags on the pants suits still had both parts intact.

Shortly after the pants suits were brought up to the security office, the police arrived. Aguilera testified that when the police arrived they asked him if he had been firing his gun and he said no. The defendant, Aguilera stated, then told the police that Aguilera had shot at him which Aguilera denied. On cross-examination Aguilera stated that he did not hear any shots fired that evening. Aguilera stated that he later signed a complaint against the defendant. It was later noticed that the complaint listed only four pants suits having been stolen, Aguilera testified, so the complaint was changed to read six pants suits. The six pants suits which were entered into evidence contained two each of sizes 7 and 13 and one each of sizes 5 and 9.

Ray Samlow, the soft lines merchandise manager of the store and the store's acting manager on the night of the incident, was then called as a witness for the prosecution. He testified that he had also been observing the defendant and his companion while they were in the store. He had observed them proceed to the drug department and then to the checkout counter. He testified that he did not observe the defendant carrying a bag. However, during this time, Samlow testified, he could not observe the lower portion of the defendant's body because from where he was standing the merchandise counters, which were 5 feet high, blocked his view. He testified that he then saw the defendant walk through the checkout line, glance up at an overhead mirror and walk back through the line. Samlow testified that at this time he could see the lower part of the defendant's body and the defendant was not carrying anything. He did not, however, observe the defendant when the defendant later left the store.

A short time later one of the store clerks yelled to Samlow, he testified, and he observed the defendant hit and push Aguilera who fell backwards. Samlow and Aguilera then pursued the defendant until they apprehended him in the alley. Samlow testified that he never heard Aguilera fire his gun.

Samlow testified that the six pants suits submitted into evidence had arrived in the store the day prior to the incident and were the only pants suits of that type in the store the day of the incident. The only other items on the rack where they were hanging were six skirt suits. The next time he

saw the pants suits was when they were brought up to the security office in a bag after they had apprehended the defendant.

Edwin Kennedy, a security guard for the store, was the final witness called by the prosecution. He testified that an employee of the store named Pearl came into the store carrying a full brown bag and that he escorted her while she carried the bag up to the security office.

The defendant testified on his own behalf. He stated that on the day of the incident he had gone to the Community Discount Center with a friend, Ronda Harrison. Miss Harrison, he testified, picked out four outfits including a blue outfit with checks or flags on it, a dress suit, a pants suit and another one which he could not remember. None of the outfits was part of the allegedly stolen merchandise, he testified. He had intended to buy one outfit for Miss Harrison, but when she insisted that he buy all four, he walked out of the store. He was not carrying a shopping bag when he left, he stated.

The defendant testified that when he left the store, Aguilera touched or grabbed his arm and hollered inside the door, "Is he the one?" The defendant then pulled his arm away and began walking away. Aguilera pulled out his gun and the defendant ran. The defendant testified that Aguilera fired two shots at him. During the whole incident, defendant testified, Aguilera never identified himself as a security guard. He was apprehended and taken to the security office, he testified. When police arrived they asked who had been firing shots. He stated that the police took Aguilera's gun, removed two spent cartridges and dropped them because they were still hot. While the police were leading him out of the store, defendant testified, one policeman jerked the defendant's handcuffs and pushed him on the shoulder, causing his knee to break a window and cutting his knee. He stated that he was treated at Illinois Masonic Hospital and he offered in evidence a hospital card bearing the name "Christofer Harris" and the address "1306 West Roosevelt." The prosecutor then stated:

> "I don't mean to be facetious but the first question put to the witness, he said his name was Wilbert Harris. The complaint says Christofer Harris. The card says Christofer Harris. I just want to make sure Christofer Harris is Wilbert Harris."

The defendant stated that "Christofer" was not his name but that it had been put on the card because one of the police officers at the hospital told them that that was his name.

On cross-examination the prosecutor inquired into the defendant's name and address. When the defendant took the stand on direct examination, he stated that his name was Wilbert Harris and that he lived at 1306 West Roosevelt Road. However, a motion to reduce the defendant's bond had been filed previously in the name of Christofer

Harris, and when asked by the court when his case was called what his name was, the defendant said "Christofer Harris." The prosecutor asked on cross-examination if the defendant went by any other name than Wilbert Harris, and the defendant stated "Bubba." Over defense objections the prosecutor asked several questions concerning whether the defendant used any names other than Wilbert Harris. Also on cross-examination the prosecutor asked, "You don't live near there [the store], do you?" and the defendant said yes, "On Belmont, Buena 4100." When the prosecutor stated, "I thought you said you lived on West Roosevelt," the defendant stated that his mother lived at the West Roosevelt address and that he lived at "both places." The prosecutor continued to question the defendant about where he was living and when he had moved from the Roosevelt address to the northside address. The defendant later stated he lived on Broadway. During the closing argument the prosecutor pointed out the inconsistencies in the defendant's testimony concerning his name and address. The jury entered guilty verdicts on the theft and battery charges but found the defendant innocent of a criminal damage to property charge which related to the breaking of the store window when the defendant was leaving the store.

■■ The defendant's first contention is that he was not proven guilty beyond a reasonable doubt. Defendant argues that the State's case rests on the testimony of the security guard Aguilera who testified that he saw the defendant leave the store with merchandise he had not paid for and that Aguilera's testimony was contradicted by both the defendant and the State's witnesses. The defendant emphasizes that the store manager, Samlow, testified that he had observed the defendant while he was in the store, but never saw the defendant carrying the brown shopping bag which Aguilera stated the defendant used to carry the pants suits from the store. We note, however, that Samlow also stated that the merchandise counters were too high to allow Samlow from where he was standing observe whether the defendant was carrying a shopping bag. The only time he saw the lower part of the defendant's body was when the defendant walked through the checkout line and then went back through the line. While he did not observe the defendant with a bag at this time, he also stated that he did not observe the defendant when he later left the store. It was when the defendant passed through the checkout line the last time and exited the store that Aguilera testified that he saw the defendant carrying the bag. We find no contradiction here.

■■ The defendant also notes that there was a dispute as to whether Aguilera fired his gun during the incident. Aguilera said he did not and his testimony was corroborated by Samlow's testimony. Only the defendant testified that Aguilera had fired his gun. Such inconsistencies in testimony are for the trier of fact to resolve when determining the credibility of the

witnesses. (*People v. Handley*, 51 Ill. 2d 229, 282 N.E.2d 131; *People v. Dee*, 26 Ill. App. 3d 691, 325 N.E.2d 336.) Other inconsistencies in the record that the defendant points out, such as what time the bag was brought up to the security office and the fact that the complaint had originally listed four pants suits being stolen rather than six, we do not find of a serious nature. It is for the trier of fact and not a reviewing court to resolve such matters. We are of the opinion that the defendant was proven guilty of theft beyond a reasonable doubt.

■■ Regarding the battery charge, the defendant contends that Aguilera had no authority to arrest the defendant unless he had observed him committing a criminal act. (Ill. Rev. Stat. 1973, ch. 38, par. 107—3.) Therefore, defendant argues, he was justified in "resisting" Aguilera. As we have already determined that the theft charge was proven beyond a reasonable doubt and the jury therefore had properly concluded that Aguilera had observed the defendant committing a crime, this argument has no merit.

The defendant's second contention is that the court erred in allowing the prosecution to impeach the defendant by asking him questions regarding the defendant's proper name and address. The defendant argues that raising the issue of alleged aliases and different addresses of the defendant prejudiced him by bringing before the jury an inference that the defendant was of criminal character. Defendant contends that these matters were outside the scope of direct examination and were collateral matters which were improper subjects for impeachment.

■■ We note that these matters were raised first by the defendant. The defendant testified on direct examination that his name was Wilbert Harris and that he lived at 1306 West Roosevelt. However, earlier when the case was called and the court asked the defendant's name, he answered "Christofer Harris." During direct examination of the defendant his defense attorney entered into evidence a hospital appointment card with the name "Christofer Harris" on it. Even before the prosecution had asked any questions of the defendant, there was considerable confusion as to the defendant's name. When the hospital appointment card was offered in evidence the prosecutor then stated he wanted to "make sure Christofer Harris is Wilbert Harris" and he proceeded to question the defendant on why the name Christofer was on the card and why the defendant had earlier answered to the name Christofer. We are of the opinion that there was nothing improper about the prosecutor's effort to clear up the matter.

The confusion over the defendant's address was also initially raised by the defendant. He had stated on direct examination that he lived at 1306 West Roosevelt, which is a south-side address. The Community Discount Store in question was located on the north side of Chicago. The

prosecutor on cross-examination asked, therefore, "You don't live near there [the store], do you?" The defendant stated that he did and said he lived, "On Belmont, Buena 4100." Later the defendant said he lived on Broadway. The prosecutor had a right to question the defendant on why he was shopping in an area far from his home, perhaps to raise the inference that the defendant had gone to a store where he would not be recognized because he intended to steal some merchandise. Whatever the prosecutor's motive, his initial question was not improper, was not out of the scope of direct examination, and there is no reason to believe that the prosecutor even realized that his initial question would bring out the fact that the defendant did not live at the south-side address the defendant had originally testified to. If the prosecutor dwelt on the matter of the defendant's name and address more than he should, we are of the opinion that this was not prejudicial to the defendant, as it brought out nothing which had not already been raised by the defendant.

The defendant has cited two Federal cases which criticize prosecutors who label a defendant with aliases. (*D'Allessandro v. United States* (3d Cir. 1937), 90 F.2d 640; *United States v. Grayson* (2d Cir. 1948), 166 F.2d 863.) However, in *D'Allessandro* the use of aliases was not the basis of their decision and the court affirmed the conviction. In *Grayson* the court stated that while they condemned the prosecution's tactics, such an occurrence, they stated, "would not * * * even remotely * * * justify a reversal." (166 F.2d 863, 867.) Furthermore, in both *D'Allessandro* and *Grayson*, unlike our case, the aliases had been brought out first by the prosecution when they had listed them on the defendant's indictment. In our case the defendant raised the issue by his own testimony.

■■ The defendant also objects to the prosecutor's comments on the confusion over the defendant's name and address during the State's closing argument. The prosecutor apparently made these comments in an effort to raise questions about the credibility of the defendant's testimony. The defendant, however, failed to object to these statements at trial and has therefore waived his right to raise the point on appeal. (*People v. Donald*, 29 Ill. 2d 283, 194 N.E.2d 227.) While we agree with the defendant's contention that such an issue is not waived by a failure to object where a prosecutor's statements deny the defendant a fair trial, we are of the opinion that these statements did not deny the defendant a fair trial.

The defendant's final contention is that his battery conviction should be reversed because the battery was part of the same transaction as the theft and convictions and sentences for two offenses which arise from the same transaction are improper, requiring a reversal of the conviction for the lesser offense. (*People v. Murrell*, 60 Ill. 2d 287, 326 N.E.2d 762.) The rule barring convictions and sentences for two or more offenses which arise

from the same conduct was established in Illinois by *People v. Schlenger*, 13 Ill. 2d 63, 147 N.E.2d 316. In that case the Illinois Supreme Court decided that multiple convictions and sentences for different offenses which arose out of the same conduct would not be allowed to stand even though the sentences were to run concurrently. Such multiple convictions, the court reasoned, would prejudice the convicted person because they would be taken into consideration when he was being considered for parole. In *Schlenger* the defendant had been convicted of both armed robbery and grand larceny for the robbery of a single person during a single incident. The court reversed the lesser offense of grand larceny.

Subsequently, subsection 1—7(m) of the Illinois Criminal Code was adopted which barred courts from imposing consecutive sentences upon convicted persons where the offenses resulted from the "same conduct." (Ill. Rev. Stat. 1971, ch. 38, par. 1—7(m).) While this statutory provision only dealt with consecutive sentencing, the Illinois Supreme Court in construing it expanded it to prohibit multiple sentences even where they were to run concurrently. (*City of Chicago v. Hill*, 40 Ill. 2d 130, 238 N.E.2d 403.) Section 1—7(m) has now been replaced by section 5—8—4(a) of the Unified Code of Corrections (Ill. Rev. Stat. 1973, ch. 38, par. 1005—8—4(a)) which states that courts shall not impose consecutive sentences for "offenses which were committed as part of a single course of conduct during which there was no substantial change in the nature of the criminal objective." The recent Illinois Supreme Court case of *People v. Williams*, 60 Ill. 2d 1, 322 N.E.2d 819, which interprets this section of the Unified Code of Corrections is controlling in our case.

■■ In *Williams* two men forced their way into a home with the apparent objective of robbing its occupants. The man of the house then confronted the intruders with a revolver and was fatally shot, after which the intruders took cash and certain valuables from the house. Williams, one of the intruders, was convicted of burglary, armed robbery and murder and was given consecutive sentences for each offense. The court reversed the burglary conviction because it found that the burglary and armed robbery convictions arose out of the same conduct. It let both the armed robbery and murder convictions stand, however, rejecting the defendant's argument that the armed robbery conviction should also be reversed or the sentences be made to run concurrently because the murder and the robbery were all part of the same transaction. The court stated:

> "These cases do not, however, prohibit separate convictions and sentences for armed robbery and murder, even though the activity constituting both offenses was a series of very closely related acts. The purpose of the entry was robbery, not murder, and that objective changed to murder only when the robbers were

confronted by Mr. Calderone with a gun in his hand. Then, they chose to commit a separate act for the purpose of killing Mr. Calderone. That shooting can be viewed as a means of removing an obstacle to their original objective of robbery, but it is also evident that at least part of their reason for killing was to avoid injury or apprehension by Mr. Calderone. We believe that such a situation is controlled by our decision in *People v. Johnson* (1970), 44 Ill. 2d 463, in which we held that the convictions and sentences for burglary and rape were proper. As we stated in *Johnson*, cases such as *Schlenger* 'were not intended to cover situations in which more than one offense arises from a series of closely related acts and the crimes are clearly distinct and require different elements of proof.' (44 Ill. 2d at 475; see also *People v. Raby* (1968), 40 Ill. 2d 392; *People v. Harper* (1972), 50 Ill. 2d 296.) The convictions and sentences imposed upon the defendant for murder and armed robbery may both stand." (60 Ill. 2d 1, 14-15, 322 N.E.2d 819, 826-27.)

In rejecting the defendant's argument that section 5—8—4(a) of the Unified Code of Corrections would bar consecutive sentences for the armed robbery and murder convictions, the court stated:

"[A]s we earlier noted, the purpose of the robbers shifted, at least partially, at the time they shot Mr. Calderone, and we believe, after considering the events at the Calderone home in their entirety, that the act of killing Mr. Calderone was sufficient not only to establish the existence of a 'substantial change in the nature of the criminal objective,' but also to constitute a departure from a 'single course of conduct.' We hold therefore that section 5—8—4(a) is inapplicable and the consecutive sentence for murder was proper." 60 Ill. 2d 1, 15, 322 N.E.2d 819, 827.

■■ In our case the defendant's original objective was to shoplift some merchandise from the store. Shoplifting is a crime of stealth and not of violence where the perpetrator intends to take merchandise without the owner's knowledge rather than to take it by force which would lead to his identification. As in *Williams*, the defendant's objective changed when he was unexpectedly confronted by Oscar Aguilera, the security guard. As in *Williams*, the violence employed was to avoid apprehension. We are of the opinion that the battery inflicted on Mr. Aguilera resulted from a "substantial change in the nature of the criminal objective" and was a departure from a "single course of conduct" which *Williams* and section 5—8—4(a) discuss. Offenses which are independently motivated (*People v. Toliver*, 133 Ill. App. 2d 266, 273 N.E.2d 274) and which are clearly distinct and do not follow until the other offense is already complete (*People v. Raby*, 40 Ill. 2d 392, 240 N.E.2d 595; *People v. Miles*, 133 Ill.

App. 2d 599, 273 N.E.2d 647) may result in separate convictions and sentences even though they are all part of the same general transaction. In our case the battery was not perpetrated until the defendant had left the store with the goods. It was motivated by a desire to avoid apprehension rather than a desire to initially obtain the goods.

■■ The defendant has cited *People v. Murrell*, 60 Ill. 2d 287, 326 N.E.2d 762, which held that under the facts of that case the defendant could not be convicted and sentenced for both battery and theft because both offenses arose from the same transaction. We find the facts in that case distinguishable from the instant case. In *Murrell* the defendant had seized the victim by the neck, forced him against the wall and removed his billfold from his pocket. In *Murrell* the battery was a preplanned and necessary part of the defendant's objective to obtain the wallet, whereas in our case the battery was not planned and occurred only after the theft had been completed. We are of the opinion that the court acted properly in the instant case in entering a judgment and sentence on both the battery and the theft charges.

Accordingly, the judgments are affirmed.

Judgments affirmed.

SIMON and O'CONNOR, JJ., concur.